In the Matter of Joseph D. SMITH, doing business as J.D. Management Services and G.L. Properties, Debtor.

Appeal of David R. BOYER, Trustee.

No. 91–1519.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1991.

Decided July 13, 1992.

Douglas Reed Adelsperger, argued, Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, Ind., for David R. Boyer.

William I. Kohn, argued, Seth D. Linfield, Scott M. Keller, Barnes & Thornburg, South Bend, Ind., for Baker & Schultz, Inc., Joseph D. Smith and G.L. Properties.

Before CUDAHY and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

In this bankruptcy case we must decide whether a debtor's payment to a creditor within the 90-day pre-petition period is avoidable as a preferential transfer when the payment was achieved by means of provisional credit supported only by the debtor's deposit of a bad check. Through what appears to be a simple check-kiting scheme, the debtor managed to pay off a single creditor well within the 90-day preference period. Because the debtor had deposited into his account a check (which eventually failed to clear), the bank honored the check presented by the creditor, although the debtor's account contained almost nothing in actual funds. So the creditor received its full payment; the issue we must resolve is whether that payment was a transfer of the debtor's property.

I.

In February of 1987, Baker & Schultz loaned $105,000 to Joseph Smith, doing business as J.D. Management Services and G.L. Properties (the Debtor). In satisfaction of this loan, the Debtor, on September 22, 1987, delivered to Baker & Schultz a check (number 1141) in the amount of $121,345.11 drawn on the Debtor's checking account with Fort Wayne National Bank (FWNB or the Bank). On the same day, the Debtor deposited with FWNB another check (number 1100) in the amount of $125,000, and his account was credited with that amount. Baker & Schultz deposited check number 1141 at the First State Bank of Decatur. On September 23, 1987,

FWNB honored check number 1141 when it was presented for payment by the First State Bank of Decatur. When FWNB made payment on check number 1141, the Debtor's checking account contained only $163.58 of the Debtor's funds other than the $125,000 amount credited the previous day.

On September 28, 1987, FWNB learned that check number 1100 (the Debtor's $125,000 deposit) had failed to clear. The Bank then debited or "charged back" the provisional credit to the Debtor's checking account, creating an overdraft of $121,290.53. The Bank was unable to obtain a return of the overdraft amount from Baker & Schultz, which insisted that the Bank's payment on check number 1141 constituted "final payment" under Indiana Law (specifically Ind.Code § 26-1-4-213).

On December 10, 1987, FWNB filed an involuntary Chapter 7 bankruptcy petition against the Debtor. On July 22, 1988, the Trustee filed a complaint for recovery of preferential transfer pursuant to 11 U.S.C. § 547(b). The Trustee's complaint sought to recover the entire $121,345.11 paid to Baker & Schultz on the Debtor's check number 1141. Both the Trustee and Baker & Schultz filed motions for summary judgment.

The bankruptcy court found that the Debtor's payment to Baker & Schultz was a preference avoidable under section 547(b), rejecting Baker & Schultz's argument that the payment made on check number 1141 was property of the Bank rather than of the Debtor. Because the Debtor had dominion over the provisionally credited $125,000 and paid off a selected creditor, the bankruptcy court reasoned, the Debtor's property had been transferred and the estate thereby diminished. The court ordered Baker & Schultz to return the $121,345.11 to the Trustee as a preferential transfer.

The district court reversed, granting summary judgment in favor of Baker & Schultz and limiting the Trustee's preference recovery to $163.58. 123 B.R. 605 (Bkrtcy.N.D.Ind.1991). The district court emphasized that the provisional credit of $125,000 never became final, so the Debtor was never entitled to it as of right; since the Bank was not required to honor check number 1141 but nevertheless did so, the transfer to Baker & Schultz was in reality a transfer of the Bank's property, and there was no diminution of the bankrupt's estate.

## II.

We review the district court's grant of summary judgment *de novo*. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate only if, drawing all reasonable inferences in favor of the nonmoving party, we conclude that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hohmeier v. Leyden Community High Schools Dist. 212*, 954 F.2d 461, 463 (7th Cir.1992). The facts of this case are not disputed, and we are presented with a pure question of law.

Under the Bankruptcy Code's preference avoidance provision, 11 U.S.C. § 547, a bankruptcy trustee may recover certain transfers of property made by the debtor within 90 days before the date on which the bankruptcy petition was filed.[1] The present dispute concerns only one element of a preferential transfer: the transfer of "an interest of the debtor in property." It is undisputed that the other elements required under the statute are present.

The Supreme Court recently addressed the Bankruptcy Code's treatment of checks as preferential transfers in *Barnhill v.*

---

1. The threshold requirement of an avoidable preference under the Code is a "transfer of an interest of the debtor in property." The transfer must also be: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) one that enables the creditor to receive more than such creditor would receive in a Chapter 7 liquidation of the estate. 11 U.S.C. § 547(b); *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 564 (8th Cir.1988). Section 547(c) contains certain exceptions for transfers not relevant here.

*Johnson,* —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The Court held that for purposes of the 90–day preference period under section 547(b), a transfer made by check occurs on the date the check is honored rather than the date it is delivered to its recipient. The case before us presents a different issue. In *Barnhill* there was no question that there had been a transfer of the debtor's property; the question was when that transfer occurred. Here the issue is not one of timing, but of whether there has been a transfer of the *debtor's interest in property* at all. The Supreme Court's decision turned on a construction of the term "transfer," which is a matter of federal law.[2] *Id.* 112 S.Ct. at 1389. The definition of "an interest in property," in contrast, is generally a matter of state law. *Id.*

### A.

■ Since our primary concern is with interests in property, we begin with state law. We have found no Indiana authority directly addressing the property status of a check honored on the basis of provisional credit that is subsequently revoked. The Uniform Commercial Code as adopted in Indiana does address, however, the general rights of parties when a bank extends provisional credit. In order to facilitate efficiency and rapid check processing, the Commercial Code gives protection to banks that extend provisional credit to customers on the basis of a deposited item. While the proceeds of the provisional credit are in a customer's account, the bank is given the right of "chargeback," which is a "claim or lien against the customer's account." *Yoder v. Cromwell State Bank,* 478 N.E.2d 131, 135, 41 U.C.C. 173 (Ind.App.1985); Ind. Code § 26–1–4–212.[3] When, however, the customer has "withdrawn or applied" the provisionally credited funds, the bank's interest rises to a security interest in the item or proceeds thereof. Ind.Code § 26–1–4–208(1).[4] The Trustee argues that under the Indiana Code (and the U.C.C.) something must exist to which a security interest may attach once the customer uses provisionally credited funds: "That something is the ability to control disposition which is an interest in property." Trustee Br. at 9. Indiana, like other states, emphasizes control of disposition in defining the contours of property rights. *See, e.g., State v. Ensley,* 240 Ind. 472, 164 N.E.2d 342, 348–49 (1960).

In response, Baker & Schultz places emphasis on a different statutory provision—that governing final credit. Section 26–1–4–213 of the Indiana Code, as correctly noted by Baker & Schultz, provides that provisionally credited funds do not become available for withdrawal *as of right* until the provisional credit becomes final (that is, until the item supporting the provisional

---

**2.** The Court noted that the Bankruptcy Code's definition of "transfer" is an expansive one, encompassing "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54).

**3.** The provision states in part:

If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke settlement given by it, chargeback the amount of any credit given for the item to its customer's account, or obtain refund from its customer whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the

facts. These rights to revoke, chargeback, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final. . . .
Ind.Code § 26–1–4–212(1).

**4.** That provision states in part:

A bank has a security interest in an item and any accompanying documents or the proceeds of either:
(a) in case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;
(b) in case of an item for which it has given credit available for withdrawal *as of right,* to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of chargeback; or
(c) if it makes an advance on or against the item.
Ind.Code § 26–1–4–208(1).

credit clears).[5] Here, of course, it is undisputed that the provisional credit never became final. Five days after the Bank honored check number 1141, it revoked the Debtor's provisional credit and exercised its right of charge-back. Baker & Schultz's point is that since the Debtor's credit *never became available for withdrawal as a matter of right*, the Debtor never had a property interest in the "funds" in his account; those funds were a "mere bookkeeping entry." Further, the Bank was not required to honor check number 1141 when it was presented for payment; the Bank could have (and presumably should have) waited until the Debtor's check number 1100 cleared. Therefore, argues Baker & Schultz, the Bank simply assumed the risk that the Debtor's provisional credit would not become final, and it transferred its own property when it made payment on check number 1141.

Baker & Schultz's position has a certain plausibility, but it is only a superficial plausibility. The Bank's obligations under the statute are not the relevant issue. The fact that the Debtor did not have a *statutory right* to withdraw the provisionally credited funds does not entail that he had no "interest in property." Statutes are not the only source of property interests; agreements also give rise to such interests. *See Department of Financial Institutions v. Holt*, 231 Ind. 293, 108 N.E.2d 629, 634 (1952). One has a property interest, for example, in a certain amount of interest on savings in a savings account, but the amount of that interest is in reality a matter of bank policy, embodied in one's agreement with the bank, and not a matter of statute. Similarly, a bank's credit policy can be conceived of as part of a customer's agreement with the bank, so provisional

credit *could* give rise to a property interest despite section 4–213. The real question here is whether the Debtor was actually able to exercise sufficient dominion and control over the funds to demonstrate an interest in property. Although the Bank was not statutorily required to extend provisional credit, it nevertheless did so, apparently as a matter of policy.[6] So for a period of five days (until the Bank revoked the provisional credit) the Debtor had $125,000 credited to his account. By itself, such provisional credit might not evidence an interest of the Debtor in property; but the Debtor exercised dominion and control over the funds by making actual payment to a creditor. The Debtor surely had something of value during the period when the Bank was extending the provisional credit. Instead of writing a check to Baker & Schultz on September 22, the Debtor could have written several checks, paying off each of its creditors on a pro rata basis. Alternatively, the Debtor could have purchased a 40–foot yacht. The point is that the Debtor exercised significant control (over a significant amount of money) in choosing to pay off a single creditor.

Baker & Schultz's argument that the Bank simply assumed the risk of the provisional credit also misses the mark. This line of argument correctly assumes that deciding which party sustains a loss can indicate which is the actual owner of the property. *See Automobile Underwriters, Inc. v. Tite*, 119 Ind.App. 251, 85 N.E.2d 365, 367 (1949) ("It is generally said that he is the owner of property who, in case of its destruction, must sustain the loss."). Under the Commercial Code, however, it is the customer and not the bank that ultimately bears the risk of nonpayment; that is the very point of the charge-

---

**5.** That section provides in part:

> Subject to any right of the bank to apply the credit to an obligation of the customer, credit given by a bank for an item in an account with its customer becomes available for withdrawal as of right
>
> (a) in any case where the bank has received a provisional settlement for the item,—when such settlement becomes final and the bank has had a reasonable time to learn that the settlement is final....

Ind.Code § 26–1–4–213(4).

**6.** "Under current bank practice, in a major portion of cases banks make provisional settlement for items when they are first received and then await subsequent determination of whether the item will be finally paid." U.C.C. § 4–212 Comment 1. The purpose of the charge-back provision is to allow banks to extend such provisional credit without risk of substantial losses. *See generally id.*

back provision. *Yoder*, 478 N.E.2d at 135; *In re Frigitemp Corp.*, 34 B.R. 1000, 1015 (S.D.N.Y.1983), *aff'd*, 753 F.2d 230 (2d Cir. 1985); *In re United Sciences of America, Inc.*, 84 B.R. 79, 82 (Bankr.N.D.Tex.1988), *aff'd*, 893 F.2d 720 (5th Cir.1990).[7] While it is true that a bank assumes the immediate risk of nonpayment when it extends provisional credit, Baker & Schultz's argument fails to recognize that the Commercial Code places the ultimate liability for nonpayment at the feet of the customer who fails to make good on her credit. To be sure, banks confront situations such as that in the case before us, in which complete recovery is prevented by the customer's bankruptcy. But property interests are defined by state law rather than by bankruptcy law, and Indiana's statutory scheme gives banks recourse to customers to whom credit has been extended.

### B.

Still, our discussion of the Indiana Commercial Code is not entirely satisfying, since it fails to answer all of the questions definitively. One is still left pondering the conundrum: How is it possible that property of the Debtor appeared out of thin air, only to disappear in a matter of days? And if it disappeared on its own, how could its transfer have diminished the Debtor's estate? To be sure, Baker & Schultz, a creditor, was paid in full with *actual funds* on its loan to the Debtor. But the Debtor never had more than $164 in actual funds, so how could the payment to Baker & Schultz have been from the Debtor's property?

We think that some answers to these difficult questions may lie in considering the economic substance of the transaction at issue. In effect, the Debtor here obtained a loan from the Bank (through the check-kiting scheme) and used the loan proceeds to pay his debt to Baker & Schultz. We might say that the loan was unauthorized or obtained by fraud, but it was nevertheless in economic reality a loan. That is the best explanation for the Debtor's sudden acquisition of control over $125,000 despite his previous actual wealth of only $164, and of his ability to direct a valid $121,000 payment to Baker & Schultz. The situation is the same as if the Debtor had gone to the Bank, taken out a five-day loan in cash and used the cash to pay his creditor, Baker & Schultz.

Analysis of a check-kiting scheme as a loan transaction is not a novel approach. The Supreme Court has recognized that a check-kiting scheme uses a bank's credit system to create "an interest-free loan for an extended period of time." *Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089 n. 1, 73 L.Ed.2d 767 (1982). In a recent bankruptcy case very similar to the case at bar, the district court also analyzed a check-kiting scheme as a transaction involving "unauthorized loans." *In re Montgomery*, 136 B.R. 727, 733 (M.D.Tenn. 1992). And in the Supreme Court's recent *Barnhill* decision, the Court similarly examined the economic reality of the transaction in considering the effect of a bank's honoring a check: "Honoring the check, in short, left the debtor in the position that it would have occupied if it had withdrawn cash from its account and handed it over to [the creditor]." 112 S.Ct. at 1390. Finally, it is noteworthy that under the Commercial Code, a bank automatically has a security interest at the point the customer withdraws or applies provisionally credited funds. Ind.Code § 26–1–4–208(1). The

---

**7.** Baker & Schultz cites the case of *Demos v. Lyons*, 151 N.J.Super. 489, 376 A.2d 1352, 22 U.C.C. 754 (1977), for the proposition that a bank assumes the risk of loss when it makes payment on the basis of provisional credit. That case, however, is not on point. First, it does not deal with the right of charge-back under section 4–212, so it apparently does not even involve a provisional credit situation such as the one here. Second, the court in that case declared only that the bank assumed the risk of its customer's credit because the bank "paid

with full knowledge that, according to its bookkeeper, the buyers' account would thereby be substantially overdrawn." *Id.* at 500, 376 A.2d at 1357. Here, of course, the Bank had credited the account $125,000 on the basis of check number 1100, so it did not have "full knowledge" that payment to Baker & Schultz would result in an overdraft. Finally, even if *Demos* said what Baker & Schultz wishes it said, it is a New Jersey case and its authority would give way to the Indiana Court of Appeals' contrary statement in *Yoder*.

Code's scheme supports the loan interpretation, since it triggers a "collateral" in the event that a customer "borrows" provisionally credited funds by exercising control over them.

Once conceptualized as a transfer of borrowed money, the Debtor's payment to Baker & Schultz is more easily classified as a transfer of the Debtor's interest in property under both state and federal law. In *Johnson v. State*, 158 Ind.App. 611, 304 N.E.2d 555 (1973), the Indiana Court of Appeals succinctly declared: *"Borrowed money is the borrower's own money." Id.* 304 N.E.2d at 562 (emphasis in original). In that case the court held that when a borrower took out a loan he immediately had a property right in the loan proceeds—even though the borrower apparently obtained the loan under false pretenses or by fraud.[8]

■ In the bankruptcy setting, courts have held that transfers by a debtor of borrowed funds constitute transfers of the debtor's property. The leading case cited for this proposition is *Smyth v. Kaufman (In re J.B. Koplik & Co.)*, 114 F.2d 40, 42 (2d Cir.1940); others include *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 567 (8th Cir.1988); and *Brown v. First Nat'l Bank*, 748 F.2d 490, 492 n. 6 (8th Cir.1984). As *Collier* explains:

> A payment by a debtor with borrowed money, however, may constitute an avoidable preference where the loan so used was not made upon the condition that it should be applied to the particular creditor to whom it was paid over. Sim-

ilarly, a payment made by a third party to a creditor of the debtor may likewise amount to a preferential transfer, when such payment represents a loan by the third party to the debtor and the debtor, rather than the lender, designates the creditor to be paid and controls the application of the loan.

4 *Collier on Bankruptcy* ¶ 547.03, at 547–28 (15th ed.1992) (footnotes omitted). As a general rule, then, a debtor's transfer of borrowed funds is a preferential transfer of the debtor's property under section 547(b), assuming the other elements of that section are met.

The situation distinguished by *Collier* and the other authorities is an exception to the general rule, known as the "earmarking" doctrine. That doctrine is applicable only where a third party lends money to the debtor *for the specific purpose of paying a selected creditor. See, e.g., Bohlen Enterprises*, 859 F.2d at 566. In such circumstances the payment is "earmarked" and the third party simply substitutes itself for the original creditor. Such a transfer is said not to be a preferential transfer because (1) the debtor never exercises "control" over the new funds; and (2) the debtor's property (i.e., the fund out of which creditors can be paid) is not diminished. The earmarking cases cited by Baker & Schultz are inapplicable. The loan in the present case was *not* conditioned on Baker & Schultz's being paid off; the Debtor *did* exercise control by selecting and paying off a single creditor; and the Debtor's property was diminished.[9]

**8.** The court wrote:
Thus a borrower who accepts a check representing the proceeds of his loan may freely negotiate that check as his own property notwithstanding a security agreement which secures his obligation to repay.
The free right of negotiation inures to the benefit of a payee of a check even though he may have obtained the instrument by fraud. *Johnson*, 304 N.E.2d at 561.

**9.** Unlike the dissent, we believe that the power to effect a transfer of funds may not be usefully bifurcated. The exercise of control attendant to paying off a selected creditor clearly presupposes some power to disburse funds. But if, as the dissent seems to suppose, the power to disburse has to do with the ultimate source of the funds,

then no borrower would ever have the requisite control over borrowed funds—a result contrary to *Johnson v. State*, 304 N.E.2d at 562. Perhaps the dissent's point is that in this case the lender exercised its power to disburse *after* the borrower exercised his power to designate the recipient. But this should not matter; in fact, precisely the same situation was presented in *Smyth*. Here the Debtor simply took advantage of the Bank's provisional credit policy to obtain a loan. He exercised control over the proceeds by designating a recipient and thus achieving payment. The fact that the Bank did not *have to* lend the funds (by making payment on the check) is beside the point, for lenders are never forced to lend money. When they do so, whether it is by "grace," or, as here, as a matter of

The *Smyth* decision is instructive. There the debtor had delivered a postdated check to a creditor. The debtor's account contained insufficient funds to cover the check, so he instructed the creditor to present the check to the debtor's landlord, who then made the payment in cash, effectively lending the money to the debtor. A panel of the Second Circuit (A. Hand, J., joined by L. Hand and Clark, JJ.) held that the debtor's payment with the borrowed money was a preferential transfer recoverable by the trustee under the Bankruptcy Act. The court reasoned that the debtor had exercised control by selecting a creditor and had paid out funds (albeit borrowed funds) that could have been distributed to the class of creditors generally.[10] Similarly here, when the Bank made payment on check number 1141, it effectively lent that amount to the Debtor. And, as in *Smyth*, it was the Debtor who exercised control over the funds and directed payment to one creditor over others.[11]

We find even more directly applicable authority for the Trustee's recovery in two recent bankruptcy cases. Both *Bohlen Enterprises*, 859 F.2d at 563, and *Montgomery*, 136 B.R. at 733, specifically considered check-kiting schemes that resulted in payments to creditors and held that the payments were preferential transfers of the debtors' property. The schemes involved in those cases were considerably more complex than the one at issue here, but the principles are the same. The

courts looked to the debtors' "control" over funds that went to creditors and found transfers of the debtors' property, notwithstanding the fact that the property was born of fraud in the form of the debtors' check-kiting schemes. *See Bohlen Enterprises*, 859 F.2d at 567; *Montgomery*, 136 B.R. at 733.

Baker & Schultz relies on bankruptcy cases holding that provisional credits do not create property interests, particularly *Equitable Bank of Littleton v. Jobin (In re Twenty-Four Hour Nautilus Swim & Fitness Ctr.)*, 81 B.R. 71 (D.C.Colo.1987). In *Jobin*, the debtor, a health club, had received "provisional credit" on the basis of VISA credit card drafts tendered to a bank. The district court ruled that the debtor did not have a property interest in the amounts only provisionally credited to its accounts. Baker & Schultz's reliance on *Jobin* is misplaced. First, the credit card provisional credits in that case were subject to a specific contractual 120–day dispute period and thus did not become final until the end of that period. The provisional credit system for check deposits, in contrast, is aimed at facilitating rapid processing for utilization of funds in commerce. As the bankruptcy judge in the instant case noted, "Provisional credits for credit card charges, which can be charged back months after authorization, and provisional credits for checks, which can be charged back only if the check is dishonored while it is being

bank policy, the "[b]orrowed money is the borrower's own money." *Id.* Moreover, Baker & Schultz does not actually argue that the present case involves an earmarking situation, but only that the "underlying principle" of the earmarking cases compels affirmance. The earmarking doctrine, however, is essentially an exception. The relevant "underlying principle" is the principle from *Smyth*—that a transfer of borrowed funds is a preferential transfer of the debtor's property.

**10.** The court wrote:

We believe the arrangement was such that [the debtor/borrower] rather than [the lender] designated the creditor to be paid and controlled the application of the loan which it secured from its landlord. The existence of this control determines whether the payments were preferential transfers by the bankrupt or

were payments by a third party who did not make the loans generally but made them only on condition that a particular creditor receive the proceeds. The transfer here was not of special funds designated as such by the lender which could never have become generally available to all of the creditors.
*Smyth*, 114 F.2d at 42.

**11.** One might object that the "loan" in this case is different from that in *Smyth* in that it is an unauthorized loan, or a loan obtained by fraud. But the fact that the debtor's loan may have been obtained through fraud or misrepresentation does not change its character as property in these circumstances. *See, e.g., In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.1988), *cert. denied sub nom. Boxek v. Danning*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Montgomery*, 136 B.R. at 733–34; *Johnson*, 304 N.E.2d at 561.

cleared, are not sufficiently similar to require equal treatment." Bankr.Ct.Order at 8 (Oct. 26, 1989).

The case before us is distinguishable from *Jobin* and the other "provisional credit" cases on a more significant ground: the Debtor here exercised control over the provisionally credited funds. "If the Debtor determines the disposition of the funds and designated the creditor to whom payment is made, it is clear that the funds are available for payment to creditors in general, and the funds are an asset of the estate." *In re Howdeshell of Ft. Myers*, 55 B.R. 470, 474 (Bankr.M.D.Fla.1985). Our present holding is one step removed from the proposition that provisional credit, by itself, gives rise to a property interest. Here the Debtor successfully exercised dominion and control over the provisional credit, converting that credit into a loan. At the moment that the Debtor's payment to Baker & Schultz was achieved (that is, when the Bank honored check number 1141), the provisional credit ripened into an interest in property of the Debtor.[12]

■ The transfer in this case should be considered in light of the purposes of the statutory avoidance power under section 547. Two purposes animate that provision. First, the avoidance power promotes the "prime bankruptcy policy of equality of distribution among creditors" by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate. H.R.Rep. No. 595, 95th Cong., 2d Sess. 177–78 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6137–39. Second, by providing for the recapture of last-minute payments to creditors, the avoidance power reduces the incentive to rush to dismember a financially unstable debtor. *Id.; Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 661–62 (7th Cir.1992). *See generally In re Barefoot*, 952 F.2d 795, 797–98 (4th Cir.1991).

Both purposes support the Trustee's recovery of the Debtor's payment to Baker & Schultz. First, the payment represents a decidedly unequal distribution among creditors. Instead of writing a single check to Baker & Schultz for 100 percent of the amount owed to it, the Debtor could have written several checks (which presumably would also have been honored) paying off each of his creditors on a pro rata basis. Despite its having been paid off completely within the 90–day preference-recovery period, Baker & Schultz attempts to retain its payment on the basis of the fortuity (from its perspective) that the Bank had extended credit where no credit was due. Such a fortuity should not block recovery as far as the equal-distribution rationale is concerned. Baker & Schultz received a full payment on its debt, while other creditors did not; that places the payment within the scope of the avoidance power's first purpose.

Second, allowing the recapture of payments structured like the one before us would further the goal of preventing competition to dismember the debtor. Hungry creditors can exert pressure on desperate debtors to engage in such dealings. Section 547 was designed to take away the incentive for such competitive last-minute asset-grabbing.

■ One final perplexing issue must be addressed. We have concluded that the Debtor's payment involved "an interest of the debtor in property." All of section 547(b)'s formal requirements for an avoidable preference have thus been met by the Trustee. But courts have also long held that to be avoidable, transfers must result in a depletion or diminution of the debtor's *estate*. 4 *Collier* ¶ 547.03, at 547–22.2 (whether debtor's estate was depleted or diminished by transfer is a "fundamental inquiry"). This requirement is normally considered part of the search for a transfer

---

12. Again, the Second Circuit's decision in *Smyth* is helpful here. In that case the debtor essentially had "credit" with his landlord (who wanted to keep the debtor in business so that the lease would continue). 114 F.2d at 42. But the mere fact that the debtor had "credit"—i.e., an understanding with the landlord that the latter would cover his debts up to a certain limit—was not sufficient to create an interest in property of the debtor. It was only when the landlord *actually paid* a particular debt that the "credit" was converted into a loan, and thus became property of the debtor. *See id.*

of the debtor's interest in property.[13] Notice that the discussion thus far has not specifically involved the notion of the debtor's "estate"; instead we have focused on the debtor's "property." In fact, section 547 does not contain the word "estate."

What is the distinction between the debtor's "estate" and the debtor's "property"? The debtor's estate is generally not considered to come into existence until the bankruptcy petition is filed: section 541(a)(1) of the Code defines the debtor's estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case." The debtor's "property," of course, can exist before the petition is filed. Ordinarily the distinction makes no difference in preference-recovery cases, because any property of the debtor transferred in the preference period is also property that *would have been available for bankruptcy distribution at the moment the estate came into existence.* Things are different here, however. The money that Baker & Schultz received would never have been available for *bankruptcy distribution,* Baker & Schultz argues, because the Debtor's credit was revoked within five days of payment and his property shrank back down to $164—all before the bankruptcy petition was filed. Nevertheless, the transfer did "cheat" other creditors out of what they might otherwise have received, since the Debtor could have paid all creditors pro rata at the time he chose to pay Baker & Schultz. This scenario reveals an ambiguity with regard to timing. To say that the estate has been diminished would initially seem to mean that the pool available to creditors at the commencement of the case has been depleted from what it would have been but for the transfer; in other words, the estate as it exists at the commencement of the case is compared to what the estate would have included if there had been no transfer.

But it could also be interpreted more broadly to include diminishing the pool available to creditors at any time after the start of the 90–day preference period; then the debtor's pre-transfer property (that could be used to pay creditors) would simply be compared to its post-transfer property. The cases take both approaches. *Compare, e.g., In re Price Chopper Supermarkets, Inc.,* 40 B.R. 816, 820 (Bankr.S.D.Cal. 1984) (first approach), *with In re Howdeshell of Ft. Myers,* 55 B.R. 470, 474 (Bankr. M.D.Fla.1985) (second approach). The first approach seems to be called for by the locution "diminution of the *estate* ": since there is technically no estate until the time that bankruptcy proceedings commence, that would appear to be the crucial moment for scrutiny. But the more expansive approach seems to be supported by section 547 itself (which does not mention the "estate") and by the purposes underlying the preference-recovery provision. One can also argue that section 547 creates a functional "estate" 90 days before the filing of the petition, so that the diminution can occur during that earlier period. The very point of the preference-recovery provision is in a sense to engage in the legal fiction that the bankruptcy "estate" extends backward in time by 90 days.

■ We conclude in the present case that the Debtor's estate was diminished by the transfer. First, even under the first approach, the estate may have been larger "but for" the transfer to Baker & Schultz. This comparison is itself full of ambiguity because it is based on a counter-factual (what the estate "would have been" had the transfer not occurred). For a period of five days, however, the Debtor did have access to $125,000 through the provisional credit. As mentioned earlier, he could have purchased a yacht or acquired some other assets instead of paying his debt to Baker

---

**13.** *See, e.g., Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355–56 (5th Cir. 1986). The view that "an interest of the debtor in property" turns on a diminution of the debtor's "estate" would seem to conflict with the Supreme Court's admonition that the property issue is simply a matter of state law. *See Barnhill,* 112 S.Ct. at 1389. Some courts have ana-

lyzed the requirement that the debtor's estate be diminished as a separate "implicit" requirement of bankruptcy law. *See, e.g., Montgomery,* 136 B.R. at 734. This latter view would seem to conflict with section 547's specific elements. Whatever its source, the "diminished estate" element of a preferential transfer is consistently applied, and we do not disturb it today.

& Schultz; so his assets at the time the petition was filed could have been more substantial than they actually were. Second, we do not think that a strict construction of the "estate diminution" requirement should defeat recovery in the circumstances of this case. All the explicit elements of section 547(b) have been met and the Trustee's recovery here is supported by the statute's purposes. Moreover, such a strict approach applied to indirectly borrowed funds would undermine the rule governing transfers of borrowed money and would effectively overrule cases such as *Smyth*. When a debtor effectively borrows nonearmarked funds and exercises control by using the funds to pay a preferred creditor over others, the estate has been diminished.

### III.

The Debtor's transfer to Baker & Schultz was a "transfer of an interest of the debtor in property" avoidable under 11 U.S.C. § 547(b). The judgment of the district court is therefore

REVERSED.

FLAUM, Circuit Judge, dissenting.

11 U.S.C. § 547 permits a bankruptcy trustee to avoid (*i.e.*, recover) certain payments made to creditors within the 90–day pre-petition period, but only if the transferred funds were property of the debtor and not of some third party. *Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262, 110 L.Ed.2d 46 (1990); *In re Moskowitz*, 13 B.R. 357, 359 (Bankr.S.D.N.Y.1981); 4 *Collier on Bankruptcy* ¶ 547.03, at 547–[23–25] (15th ed. 1992). In this case, as the panel's thoughtful opinion clearly demonstrates, it is no simple matter to determine who owned the money that was provisionally credited to the Debtor's account and then transferred by the Bank, at the Debtor's behest, to Baker & Schultz. Because I believe that the money was, at all relevant times, the Bank's property rather than the Debtor's, I respectfully dissent.

To resolve the question of ownership in this context, we focus upon the degree to which the Debtor, as opposed to the Bank, had control over the funds at issue. *In re Royal Golf Prods. Corp.*, 908 F.2d 91, 94 (6th Cir.1990); *In re Bohlen Enter., Ltd.*, 859 F.2d 561, 565 (8th Cir.1988); *In re Hartley*, 825 F.2d 1067, 1070 (6th Cir.1987); *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1359 n. 6 (5th Cir. 1986); *Smyth v. Kaufman*, 114 F.2d 40, 42 (2d Cir.1940); 4 *Collier* ¶ 547.03, at 547–28. The panel's answer to this question rests in large part upon its characterization of the Debtor's check kiting scheme as an unauthorized loan from the Bank to the Debtor. I agree with this characterization, *Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089 n. 1, 73 L.Ed.2d 767 (1982), but suggest that it is not dispositive of the question posed. The cases and commentary recognize that the proceeds of loans used to satisfy debts owed other creditors are not necessarily deemed "property of the debtor" under § 547. *See, e.g., Coral Petroleum*, 797 F.2d at 1356; *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir.1938) (L. Hand, J.); *In re Sun Railings, Inc.*, 5 B.R. 538 (Bankr.S.D.Fla.1980); 4 *Collier* ¶ 547.03, at 547–[26–27]. The fact that the Debtor "borrowed" money from the Bank matters, but, to reiterate an observation already made, what really matters is the extent to which the Debtor exercised dominion over the loaned funds.

Suppose, to take an example, that the Debtor drove to the Bank, made out a loan, left with the proceeds, and allocated them to whomever it pleased. Under this scenario, the Debtor would have exercised control sufficient to give rise to a property interest. That was the situation in *Johnson v. State*, 304 N.E.2d 555 (Ind.App.1973), cited by the panel in support of the proposition that borrowed money is the borrower's own money. *See* Op. at 1532–33. Johnson took out an automobile loan in the form of a check, cashed it, and spent the proceeds on items other than the automobile that was to have secured the loan. There can be no doubt, as the state court held, *Johnson*, 304 N.E.2d at 561, that the loan proceeds were Johnson's property. This is true even though Johnson, owing to the security

agreement backing up the loan, was not legally entitled to do what he pleased with the cash. Johnson, having obtained *actual* possession of the proceeds, had *actual* power to decide who would receive the proceeds and, importantly, whether to disburse them at all. But borrowed money is not always the borrower's own money. Suppose that the Bank lent the Debtor money for the purpose of paying off a designated creditor by directly transferring the funds from the Bank to the creditor. Under this scenario, the Debtor would have exercised little control over the loan proceeds, and hence would not have attained a property interest therein. 4 *Collier* ¶ 547.-03, at 547-[26–27] (citing authorities).

The distinction between these two scenarios depicts, in a nutshell, the essence of both the "earmarking" doctrine and the "depletion of the debtor's estate" doctrine. These doctrines are more closely related than my colleagues suggest in their discussion at pp. 1533–37 *supra*. If a third party earmarks—meaning designates and allocates—funds to satisfy the debt owed a particular creditor, the debtor never really obtains a property interest in the earmarked funds, and hence transferring the funds does not diminish the debtor's estate. *Hartley*, 825 F.2d at 1070; *In re Taco Ed's, Inc.*, 63 B.R. 913, 925 (Bankr.N.D.Ohio 1986). Such transactions involve nothing more than a swap of creditors; the third party merely replaces the transferee as the debtor's new creditor, with no adverse impact upon the quantity or quality of the assets held, or increase in the liabilities owed, by the debtor. *Coral Petroleum, Inc.*, 797 F.2d at 1356; *In re Grabill Corp.*, 135 B.R. 101, 111 (Bankr.N.D.Ill.1991). Absent any loss of the debtor's property or depletion of its estate, other creditors are not harmed, and hence there is no real reason under § 547 to avoid the preference. *Continental and Commercial Trust & Savings Bank v. Chicago Title & Trust Co.*, 229 U.S. 435, 443–44, 33 S.Ct. 829, 831, 57 L.Ed. 1268 (1913); *Bohlen Enter., Ltd.*, 859 F.2d at 568 (McMillian, J., dissenting); *In re Titan Energy Corp.*, 82 B.R. 907, 909 (Bankr.S.D.Ohio 1988); *cf. First Nat'l Bank v. Phalen*, 62 F.2d 21, 22 (7th Cir. 1932).[1] It does not matter whether Baker & Schultz calls its legal theory "earmarking" or "no depletion of the estate," for here the two mean essentially the same thing.

This doctrinal discussion might appear to sidestep the question of when earmarking occurs, or whether an estate is depleted, but the ultimate focus upon property interests and control has remained implicit throughout. Concluding that loaned funds have been earmarked is just a shorthand way of saying "the new creditor, rather than the debtor, controlled the disposition of the funds." *See, e.g., Coral Petroleum*, 797 F.2d at 1359. Concluding that a debtor's estate has not been diminished when a third party pays off a debt owed an old creditor is shorthand for "the transferred funds were never the debtor's property because the debtor never had the power to

---

**1.** The panel suggests, in dicta, that the traditional practice of examining whether a transfer depleted a debtor's estate to determine whether the transfer was of "an interest of the debtor in property" conflicts with § 547 and prevailing Supreme Court interpretations thereof. *See* Op. at 1536 n. 13. I believe this suggestion is mistaken. Saying that a transfer did not diminish a debtor's estate is the equivalent of saying that the debtor did not transfer any of its property that was to have become part of the bankruptcy estate, as the Supreme Court recently made clear:

> Because the purpose of [§ 547] is to preserve the property includable within the bankruptcy estate ... 'property of the debtor' subject to [§ 547] is best understood as that property that would have been part of the estate had it

not been transferred before the commencement of bankruptcy proceedings. For guidance, then, we must turn to § 541, which delineates the scope of 'property of the estate' and serves as the post-petition analog of § 547(b)'s 'property of the debtor.'

*Begier*, 496 U.S. at 58–59, 110 S.Ct. at 2263. Accordingly, requiring that, to avoid a transfer, the debtor's estate must have been diminished is not, as the panel contends, "a separate 'implicit' requirement" of § 547, *see* Op. at 1536 n. 13, but rather is a way of checking whether the transfer involved the debtor's property. The venerable rule that property rights are a matter of state law, most recently restated in *Barnhill v. Johnson*, —— U.S. ——, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992), is fully consistent with this approach.

allocate them to other creditors." *See, e.g., Hartley,* 825 F.2d at 1070.

It is important, then, to determine who exercised control, and to what extent, over the money transferred from the Bank to Baker & Schultz. In this context, I suggest that control has two components: first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid. *In re Howdeshell of Ft. Myers,* 55 B.R. 470, 474 (Bankr. M.D.Fla.1985); *In re Jaggers,* 48 B.R. 33, 36–37 (Bankr.W.D.Tex.1985); 4 *Collier* ¶ 547.03, at 547–28. The Debtor, who designated Baker & Schultz as the payee of its $121,345.11 check, certainly had the first aspect of control.

My colleagues conclude that the Debtor also had the second aspect, which I henceforth will call dispositive control. They find it difficult, however, to pinpoint precisely when the Debtor obtained such control. It could not have been after the Bank honored the Debtor's check by transferring $121,345.11 to Baker & Schultz, who after the transaction enjoyed complete dominion over the disputed funds. The trustee, however, argues that because the Bank gained a security interest in the funds after transfer of the provisional credit to Baker & Schultz, *see* Ind.Code Ann. §§ 26–1–4–208(1) and 26–1–4–212(1), the security interest must have attached to something, and that something was the Debtor's property interest in the disputed funds. But this argument confuses matters. If, as in this case, a bank honors a check supported only by a provisional credit, and the credit fails to become final, the Indiana Code permits the bank, now a creditor, to seek recourse from the check writer (Debtor), not the holder (Baker & Schultz). Brushing aside some tangential technical matters, suffice it to say that the Debtor had no control over, and hence no property interest in, the

particular $121,345.11 obtained by Baker & Schultz.

Accordingly, if the Debtor ever had dispositive control over the transferred funds, it had to have been prior to the transfer to Baker & Schultz. At that point in time, the Debtor had a provisional credit of $125,000 based upon its deposit with the Bank of a (bad) check in that amount, as well as final credit of $163.58. Was this provisional credit the Debtor's property? The panel, albeit with some hesitation, suggests no in certain passages. *See* Op. at 1531 ("By itself, such provisional credit might not evidence an interest of the Debtor in property."), and 1535 ("Our present holding is one step removed from the proposition that provisional credit, by itself, gives rise to a property interest."). This conclusion, absent the hesitation, is surely correct. The Bank was under no legal obligation to make good on any checks written against the provisional credit. It was entitled to wait until the $125,000 check cleared. Ind. Code Ann. § 26–1–4–213(4)(a) (West 1980); [2] *see* J. White & R. Summers, *Uniform Commercial Code* § 18–2 (3d ed.1988) (describing traditional bank practice of putting a "hold" on an account balance supported by a deposited but as yet uncollected check); H. Bailey, *Brady on Bank Checks* ¶ 18.1 (6th ed. 1987); *United States v. Cronic,* 900 F.2d 1511, 1516 (10th Cir.1990). The Debtor could *request,* but not *direct,* the Bank to honor its check to Baker & Schultz because the check was written on insufficient funds. That the Bank complied with the Debtor's request by transferring funds to Baker & Schultz was a matter of grace extended the Debtor by the Bank. This is all a way of saying that the Debtor never had dispositive control over the provisional credit.

In other passages, however, my colleagues imply that, yes, the Debtor did have such dispositive control. When describing the "economic substance" of the check kiting scheme, they liken the Debtor's situation to that of the borrower in *State v. Johnson, supra. See* Op. at 1532

---

2. Indiana modified this provision on April 5, 1989, after the events giving rise to this dispute occurred. As such, the new statutory language does not apply to this case.

("The situation is the same as if the Debtor had gone to the Bank, taken out a five-day loan in cash and used the cash to pay his creditor, Baker & Schultz."). Somewhat earlier, they state that "[t]he Debtor surely had something of value during the period when the Bank was extending the provisional credit." Op. at 1531. I respectfully suggest that these detours inaccurately characterize the nature of the check kiting scheme, and lead the panel to disregard its assertion that account holders have no property interest in provisional credits. It is true, as I observed above in discussing *State v. Johnson,* that an individual who literally "takes out" a loan has a full property interest in the loan proceeds. The reason is that the individual has both components of control, namely power over designation and disposition. But any analogy to the Debtor misfires, for cash in hand— whether obtained through a loan, a gift, a paycheck, or whatever—is different than a provisional credit with regard to dispositive control. One can disburse cash freely (although, as in the case of Johnson's car loan, perhaps not legally) without permission. In contrast, one can disburse a provisional credit only if the bank consents, which it does not have to do. Simply stated, the difference between the Debtor's loan and Johnson's loan is that the Bank directly delivered, earmarked if you will, the loaned funds to the Debtor's creditor (i.e., Baker & Schultz), while Johnson's bank gave him the loaned funds, thus furnishing him the unfettered opportunity to deliver the funds to whomever he pleased. The panel does not address this crucial distinction in its response to this dissent. *See* Op. at 1533 n. 9.

The panel's statement that the provisional credit represented "something of value" to the Debtor seems more plausible. But that value, one learns from reading what immediately follows, relates exclusively to the first component of control, the power over designation: "Instead of writing a check to Baker & Schultz...., the Debtor could have written several checks, paying off each of its creditors on a pro rata basis. Alternatively, the Debtor could have purchased a 40–foot yacht. The point is that

the Debtor exercised significant control ... in choosing to pay off a single creditor." Op. at 1531; *see also* Op. at 1536. This begs the question, of course, of who held dispositive control, the answer to which, I maintain at the risk of beating a dead horse, was the Bank. Without dispositive control, any "value" supposedly inherent in the provisional credit was illusory. The Debtor, for all practical purposes, was in the same position as any prospective lender seeking a particular amount of credit from the Bank. Both could ask the Bank to deliver on their behalf a specific amount of money to a particular third party. That the Debtor had something called a provisional credit, or that the Bank at times honored checks supported by nothing more than a provisional credit, is immaterial. *In re Frigitemp Corp.,* 34 B.R. 1000, 1015–16 (S.D.N.Y.1983) (Sofaer, J.), *aff'd,* 753 F.2d 230 (2d Cir.1985). Essential is the fact that the Bank does not have to lend money either to the holder of provisional credit or to the random prospective lender. A bare provisional credit is no more a property interest than is the bare hope that the Bank will satisfy any request for a loan, which is to say not at all.

It should be clear that the Debtor had dispositive control over the transferred funds neither before nor after the transfer. My colleagues seem to implicitly acknowledge this, for after exploring the issue in some depth, they ultimately conclude that the Debtor obtained a property interest "[a]t the moment ... the Debtor's payment to Baker & Schultz was achieved," namely when the Bank honored Debtor's check to Baker & Schultz. Op. at 1535. Control, in other words, vested instantaneously at the time of transfer. But it would have had to have vanished immediately thereafter, or maybe at the same time. It might be of some philosophical interest to ponder what actually happened, if anything, at this existential moment, but any such exercise would provide a slim reed upon which to rest a conclusion that the Debtor exercised any kind of dispositive control over the transferred funds.

[131]

There is a much simpler explanation for what happened here. The Bank never made the provisionally credited funds available for the Debtor's general use. It exercised dispositive control at all points prior to the time Baker & Schultz took possession. When the Bank made the funds available—which was at the precise time of transfer to Baker & Schultz, for recall that the Bank could have legally refused to honor the check any time before then—it was for the sole benefit of one party, Baker & Schultz. As a result, the funds were never "property that would have been part of the [Debtor's] estate had [they] not been transferred before the commencement of bankruptcy proceedings." *Begier*, 496 U.S. at 58, 110 S.Ct. at 2263. The Debtor merely asked the Bank to loan it money on the strength of its provisional credit, and the Bank, as a matter of grace, complied. In other words, the Bank directed the funds to Baker & Schultz, assuming that party's position as one of the Debtor's unsecured general creditors. The Debtor's other creditors—all of whom, incidentally, were in far less deep than Baker & Schultz and now the Bank—were not harmed by this switch in creditors, a switch which had no effect upon the Debtor's estate. *In re Castillo*, 39 B.R. 45, 46–47 (Bankr.D.Colo. 1984). Perhaps they were harmed slightly by the Debtor's designation of Baker & Schultz as the recipient of its rubber check, but no more than other creditors in this type of earmarking situation, which is to say not in a way recognized under § 547. *Continental & Commercial Trust*, 229 U.S. at 443–44, 33 S.Ct. at 831. The Bank was certainly harmed, but no more than any other third party lender left holding the bag after paying off old creditors. The Bank did not have to honor the check the Debtor gave Baker & Schultz. In fact, no bank *should* have honored a $121,345.11 check written against $163.58 in actual funds and a $125,000 provisional credit. The fact that the Bank did so provides no basis in law or equity to avoid more than $163.58 of the transfer to Baker & Schultz under § 547.

I would affirm the decision of the district court.