**In re DAYTON TITLE AGENCY, INC., Debtor–In–Possession.**

**Dayton Title Agency, Inc., et al., Plaintiffs,**

v.

**The White Family Companies, Inc., et al., Defendants.**

**No. 99–35768.**
**Adversary No. 99–3664.**

United States Bankruptcy Court, S.D. Ohio, Western Division.

May 15, 2001.

BOK Mortgage, Tulsa, OK, pro se.

Sharyn J. Bennett, Robert B. Berner, Stephen K. Dankof, Donald F. Harker, III, Ronald S. Pretekin, Walter Reynolds, Charles D. Shook, Dayton, OH, David S. Cupps, Frederick L. Ransier, Columbus, OH, Stewart H. Cupps, Roger E. Luring, De Wayne Smith, Troy, OH, William B. Fecher, Jerome J. Metz, Jr., Cincinnati, OH, James P. Hickey, Jr., Oakwood, OH, for creditors.

Alan A. Biegel, Kettering, OH, Robert J. Eilerman, Lawrence S. Walter, Dayton, OH, for Interested parties.

Courtney M. Brady, Dayton, OH, pro se.

Centex Home Equity, Dallas, TX, pro se.

Fifth Third Mortgage, Cincinnati, OH, pro se.

Anne M. Frayne, Dayton, OH, for debtor.

GMAC Mortgage Corp., Waterloo, IA, pro se.

Liberty Lending Services, Inc., Wilmington, OH, pro se.

Mary Stickelman, Franklin, OH, pro se.

WILLIAM A. CLARK, Bankruptcy Judge.

**DECISION OF THE COURT:**

**1) GRANTING PARTIAL SUMMARY JUDGMENT TO DEFENDANTS THE WHITE FAMILY COMPANIES, INC. AND NELSON WENRICK ON THE ISSUE OF DAYTON TITLE AGENCY, INC. BUSINESS TRUST'S INELIGIBILITY FOR SEPARATE BANKRUPTCY TREATMENT;**

**2) GRANTING SUMMARY JUDGMENT TO DAYTON TITLE AGEN-**

CY, INC. ON RECOVERY OF FRAUDULENT TRANSFERS UNDER OHIO'S UNIFORM FRAUDULENT TRANSFER ACT AND DENYING SUMMARY JUDGMENT TO DEFENDANTS ON SAME;

3) DETERMINING NATIONAL CITY BANK'S MOTION FOR SUMMARY JUDGMENT TO BE MOOT; AND

4) GRANTING DAYTON TITLE AGENCY, INC.'S REQUEST FOR PREJUDGMENT INTEREST AND COURT FILING COSTS.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the standing General Order of Reference entered in this district. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(E) and (H). The following decision is determined in accordance with Fed.R.Bankr.P. 7056.

This matter is before the court upon the following three motions for summary judgment and responsive memoranda:

1) The Motion of Plaintiff National City Bank for Summary Judgment filed against Defendants The White Family Companies, Inc. and Nelson Wenrick [Adv.Doc. # 99–1], Defendants' Memorandum Contra [Adv.Doc. # 121–1] and Reply Memorandum of Plaintiff National City Bank [Adv. Doc. # 135–1];

2) The Motion of Plaintiffs Dayton Title Agency, Inc. and Dayton Title Agency, Inc. Business Trust for Summary Judgment Against Defendants The White Family Companies, Inc. and Nelson Wenrick [Adv.Doc. # 103–1], Defendants' Memorandum Contra [Adv.Doc. # 133–1] and Reply Memorandum of Plaintiffs Dayton Title Agency, Inc. and Dayton Title Agency, Inc. Business Trust [Adv.Doc. # 136–1]; and

3) The Defendants, White Family Companies, Inc. and Nelson Wenrick's, Motion for Summary Judgment Against Dayton Title Agency, Inc., Dayton Title Agency, Inc. Business Trust and National City Bank and Memorandum in Support [Adv. Docs.# 125–1 and 126–1], Memorandum of Plaintiff National City Bank in Opposition [Adv.Doc. # 134–1], Memorandum of Plaintiffs Dayton Title Agency, Inc. and Dayton Title Agency, Inc. Business Trust in Opposition [Adv.Doc. # 138–1], Defendants' Reply to National City Bank's Memorandum [Adv.Doc. # 140–1] and Defendants' Reply to Dayton Title's Memorandum [Adv.Doc. # 143–1].

## FACTUAL AND PROCEDURAL BACKGROUND

Debtor–in–Possession, Dayton Title Agency, Inc. ("Dayton Title"), whose bankruptcy case is jointly administered with the related Dayton Title Agency, Inc. Business Trust ("DTABT") bankruptcy, was a Dayton area title agency founded in 1973. [Adv.Doc. # 67–1, Depo. of Alex Katona ("Katona Depo."), p. 42.] Beginning in 1996, Dayton Title conducted closing agent services on real estate transactions for Krishan Chari ("Chari"), a real estate broker affiliated with Don Wright Realty. [Adv.Doc. # 70–1, Depo. of Pam Folino ("Folino Depo."), pp. 25–27.] Many of these transactions involved Chari channeling funds through Dayton Title's trust accounts which were used primarily to hold third party escrow funds related to the title agency's real estate closings. [Id., pp. 17–18.]

Beginning in November of 1998, Dayton Title experienced difficulties collecting funds from Chari to cover disbursements made at his direction through the trust

accounts. In at least one transaction, Dayton Title disbursed funds on behalf of Chari before Chari made a deposit into its account. [Adv.Doc. # 129–1, Ex. 3.] In connection with this same transaction and many others, Chari's checks were returned for insufficient funds. [*Id.*, Exs. 3, 5, 11–18, 20–21, 23–24.] Some of the bounced checks resulted in substantial overdrafts in a Dayton Title trust account. [Adv.Doc. # 130–1, Ex. 70 at NCB 00277 and Adv. Doc. # 131–1, Ex. 71 at NCB 00255.]

At the center of the present dispute are transactions conducted at Chari's direction through one of Dayton Title's trust accounts with National City Bank involving Chari's real estate investment enterprise, Invesco, LLC. [Folino Depo., pp. 27–28.] Invesco was run by Chari and his partner Michael Karaman. [*Id.*] Beginning in December of 1998, two separate entities, the White Family Companies, Inc. ("WFC") and Nelson Wenrick ("Wenrick") provided short term financing, called bridge loans, to Invesco for purported real estate transactions. [Adv.Doc. # 52–1, Depo. of Timothy White ("White Depo."), pp. 28–30; Adv.Doc. # 53–1, Depo. of Nelson Wenrick ("Wenrick Depo."), pp. 14–29.] The purpose of the loans, each involving over one million dollars, was to facilitate Invesco in the purchase of commercial real estate for attractive prices. [White Depo., p. 30; Adv.Doc. # 132–1, Ex. 95.] The duration of each loan was only 30 or 45 days, long enough for Invesco to procure permanent financing. [Adv.Doc. # 90–1, Depo. of Dave Alexander ("Alexander Depo."), p. 148; White Depo., pp. 30, 34–36; Wenrick Depo., p. 29.] These loan transactions were usually closed at Dayton Title's facilities [Alexander Depo., pp. 34–35, 53, 68, 87–88, 101, 113; Wenrick Depo., p. 16] and were evidenced by notes signed by Michael Karaman on behalf of Invesco [Adv.Doc. # 132–1, Ex. 95]. Each note carried a second signature of Michael Karaman as personal guarantor. [*Id.*]

Between December 1, 1998 and July 12, 1999, WFC made five bridge loans to Invesco ranging from $1,900,000.00 to $3,200,000.00. [*Id.*] In a completely separate transaction, Wenrick furnished a $1,200,000.00 bridge loan to Invesco on August 4, 1999. [*Id.*] Each loan transaction was carried out by the lender depositing the funds into one of Dayton Title's accounts. [Adv.Doc. # 132–1, Exs. 99–103, 105.] These loans were paid back in fall, but not always before the due dates. [Adv.Doc. # 132–1, Ex. 95; Adv.Doc. # 103–1, Exs. G, N, T, AA, GG; Wenrick Depo., pp. 235–236.]

On September 3, 1999, WFC and Wenrick each provided a final bridge loan to Invesco of $3,200,000.00 and $1,600,000.00 respectively. [Adv.Doc. # 132, Ex. 95.] The loans were made in connection with the supposed purchase of property containing a Staples retail office supply store. [Wenrick Depo., pp. 242–244; White Depo., pp. 144–145.] Like the previous loans, these were evidenced by notes containing Michael Karaman's signature as President of Invesco and a second signature of Michael Karaman as personal guarantor of the loans. [Adv.Doc. # 132–1, Ex. 95.] According to the notes, Invesco was to repay the principle and interest on the short-term loans on or before October 3, 1999. [*Id.*]

Soon after the loans were past due, WFC and Wenrick were repaid with checks drawn on a Texas IOLTA account of John Lewis. [Adv.Doc. # 103–1, Ex. OO; Alexander Depo., pp. 118–119; Wenrick Depo. pp. 24–25.] Both checks were returned for insufficient funds. [Wenrick Depo. pp. 24–25; Alexander Depo., pp. 122–123.]

Subsequently, on October 19, 1999, Krishan Chari had a $5,000,000.00 check

deposited into Dayton Title's trust account with National City Bank for the purpose of paying WFC and Wenrick. [Adv.Doc. # 99–1, App. A, Ans. to Interrog. 3(c); Adv.Doc. # 132–1, Exs. 97 and 98.] The check was purportedly drawn on a DCW Investments account at Oak Hill Bank. [*Id.*] The teller at National City Bank did not place a hold on the check Chari deposited. [Adv.Doc. # 132–1, Ex. 109.] On that same day, pursuant to Chari's instructions, Dayton Title issued a check payable to WFC in the amount of $3,260,000.00 and a check payable to Wenrick in the amount of $1,625,000.00 from the trust account. [Adv.Doc. # 103–1, Ex. 2, Affidavit of Pam Folino ("Folino Aff."), ¶ 4; Adv.Doc. # 132–1, Ex. 111.] The remaining $115,000.00 from Chari's $5,000,000.00 check was to remain in Dayton Title's trust account for fees payable to Dayton Title for unrelated transactions. [Folino Aff., ¶ 4.]

On October 20, 1999, Tim White presented the WFC check to a teller at National City Bank and obtained an official bank check in return. [White Depo., pp. 154–155; Adv.Doc. # 99–1, App. A., Ans. to Interrog. 3(a).] Wenrick deposited his check in an account at Security National Bank. [Wenrick Depo., pp. 39–45.] Wenrick's check cleared the trust account at National City Bank on October 25, 1999. [Adv.Doc. # 99–1, App. A., Ans. to Interrog. 3(b).]

On or about October 26, 1999, National City Bank received notification that the check deposited by Chari in Dayton Title's trust account was being returned. [Adv. Doc. # 132–1, Ex. 97.] However, WFC and Wenrick's checks were honored by National City Bank prior to the bank's discovery that Chari's check was a forgery drawn on a non-existent account. [Adv. Doc. # 99–1, App. A, Ans. to Interrog. 3(a) through 3(c), 5 and 6.] Chari deposited two subsequent $5,000,000.00 checks into Dayton Title's trust account which also bounced. [Adv.Doc. # 131–1, Ex. 79; Adv. Doc. # 132–1, Exs. 97 and 118.] Consequently, National City Bank made the decision to freeze Dayton Title's accounts on November 4, 1999. [Adv.Doc. # 132–1, Ex. 119.]

Because Chari's checks were returned, the funds in Dayton Title's trust account did not cover the checks written to WFC and Wenrick that were already honored by National City Bank. This chain of events caused Dayton Title's trust account to be substantially overdrawn. According to an account statement, Dayton Title had a negative balance of $4,142,151.38 in the trust account as of November 19, 1999 [Adv.Doc. # 131–1, Ex. 80] indicating that approximately $742,848.62 of the funds transferred to WFC and Wenrick represent money that had been in Dayton Title's trust account at the time of the conveyance. No party disputes that the funds in the account represent third party escrow funds held in trust by Dayton Title. [Adv. Doc. # 129–1, Ex. 2; Folino Depo., pp. 17–18.]

After learning of the forgery and the loss of over $ 4,000,000.00 in the trust account, Dayton Title Agency, Inc. and Dayton Title Agency, Inc. Business Trust filed separate Chapter 11 bankruptcy petitions on November 8, 1999. On November 10, 1999, both entities initiated adversary proceedings [1] against WFC and Wenrick to recover the $4,885,000.00 paid out of Dayton Title's trust account as fraudulent

---

1. Because they contain identical claims against WFC and Wenrick, the two adversary proceedings of Dayton Title Agency, Inc. (Adv. # 99–3664) and Dayton Title Agency, Inc. Business Trust (Adv.# 99–3663) have been jointly administered for procedural purposes with filings located in Adv. # 99–3664.

transfers under provisions of the Bankruptcy Code and Ohio statutory law. National City Bank has been joined as a plaintiff-intervenor in the recovery of the funds.

All of the parties have filed motions for summary judgment asserting that the essential facts to the resolution of this adversary proceeding are undisputed. After reviewing the motions for summary judgment, the responsive memoranda, and the oral arguments of counsel, the court is prepared to render its decision.

## LEGAL ANALYSIS

### A. Summary Judgment Standard

The appropriate standard to be used by the court to address the motions for summary judgment filed in this adversary proceeding is contained in Fed.R.Civ.P. 56(c) and incorporated in bankruptcy adversary proceedings by reference in Fed. R.Bankr.P. 7056. Rule 56(c) states in part that a court must grant summary judgment to the moving party if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In order to prevail, the moving party, if bearing the burden of persuasion at trial, must establish all elements of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the burden is on the non-moving party at trial, the movant must: 1) submit affirmative evidence that negates an essential element of the non-moving party's claim; or 2) demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* at 331–332, 106 S.Ct. 2548.

Thereafter, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 586–588, 106 S.Ct. 1348.

### B. Dayton Title Agency, Inc. Business Trust's Ineligibility for Bankruptcy Protection

Initially, the court will discuss WFC and Wenrick's collateral argument that one of the debtors, Dayton Title Agency, Inc. Business Trust ("DTABT"), is ineligible for separate bankruptcy protection from Dayton Title because DTABT does not meet the definition of a true business trust.

■ Under § 109(a) of the Bankruptcy Code, only individuals defined as "persons" are eligible for bankruptcy relief. Persons include corporations and, as a subset of corporations, business trusts. 11 U.S.C. § 101(9)(A)(v) and (41). Trusts other than business trusts are not eligible for bankruptcy protection. *Brady v. Schilling (In re Kenneth Allen Knight Trust),* No. 96–5353, 1997 WL 415318, at *2 (6th Cir. July 22, 1997).

■ The Bankruptcy Code does not define "business trust" and the courts have not adopted a uniform definition of the term for bankruptcy eligibility. *Knight,* 1997 WL 415318, at *2–3. However, because the term is included in the Bankruptcy Code as a species of corporation, it must have attributes of a corporation to be a business trust. *Id.* at *3. One main

characteristic determining a business trust is whether it was created with the primary purpose of transacting business or carrying on commercial activity for a profit. *Id.* at *4 (relying on the analysis set forth in *In re Treasure Island Land Trust*, 2 B.R. 332 (Bankr.M.D.Fla.1980)). Trusts designed merely to preserve the trust res for beneficiaries do not meet this definition. *Id.*

■ In this case, DTABT has few, if any, attributes of a corporation separate from Dayton Title. DTABT has no written agreement or articles of incorporation memorializing its creation. [Katona Depo., pp. 89–92.] Furthermore, the trust has no principals, officers or tax identification number separate from Dayton Title. [*Id.*, p. 90; Adv.Doc. # 132–1, Ex. 121.] Most significant to the Sixth Circuit's interpretation of business trust is the fact that DTABT generates no income. [Katona Depo., p. 90.] Instead, the business trust is a group of escrow accounts used by the title agency to collect and disburse funds for real estate closings. [*Id.*, pp. 79–81.] It was created as a requirement of the underwriters issuing Dayton Title Agency, Inc.'s insurance policy to make certain that the escrow funds coming in for closings and related business were not commingled with the title agency's operating funds. [*Id.*, p. 89.]

Although these activities may fall within the definition of "business trust" for the underwriters' purposes, they do not qualify the entity as a business trust for bankruptcy eligibility. As such, the business trust and its accounts are more properly considered within the context of Dayton Title's bankruptcy filing. The court grants summary judgment to WFC and Wenrick with regard to this issue.

While DTABT does not qualify as a business trust for bankruptcy purposes, the court finds no reason why this determination should effect proceedings related to the adversary complaint filed by Dayton Title. The two identical adversary proceedings initiated by Dayton Title and DTABT against WFC and Wenrick have been jointly administered until this juncture. Because no party disputes that Dayton Title is a proper debtor before the bankruptcy court and may maintain adversarial claims against WFC and Wenrick, the court will continue its analysis of the issues remaining on summary judgment with respect to Dayton Title disregarding DTABT as a separate debtor.

## C. Recovery of the Transfers Under Ohio's Uniform Fraudulent Transfer Act

In its motion, Debtor–in–Possession Dayton Title requests summary judgment asserting that the funds transferred to WFC and Wenrick from the Dayton Title trust account are recoverable as fraudulent transfers under the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev. Code §§ 1336.01 *et. seq.* Avoidance of a transfer under state fraudulent transfer laws is permitted by the "strong arm" provisions of the Bankruptcy Code found in 11 U.S.C. § 544. *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 697 n. 3 (6th Cir.1999). Under § 544, a bankruptcy trustee, or a debtor-in-possession acting with the powers of a trustee, steps into the shoes "of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors." *Id.*

■ The significant provision of the UFTA is Ohio Rev.Code § 1336.04 which provides, in pertinent part:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the trans-

fer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code § 1336.04. While § 1336.04(A)(1) covers claims of actual fraud, § 1336.04(A)(2) has a broader scope encompassing claims of constructive fraud where the focus is on the effect of the transaction rather than the intent with which it was undertaken. *Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 667, 729 N.E.2d 768, 780 (Ohio Ct.App.1999). In fact, a constructive fraud claim under § 1336.04(A)(2) may exist even without any intent on the part of the debtor to hinder, delay, or defraud a creditor. *Id.*

Dayton Title focuses specifically on the unreasonably small asset theory of § 1336.04(A)(2)(a). Under this provision, the party attempting recovery must prove that the debtor transferred an interest in its property for less than reasonably equivalent value leaving it with unreasonably small assets compared to the debtor's "historical level of assets or cash flow and current needs." *Mayne*, 133 Ohio App.3d

at 668, 729 N.E.2d at 780. This very broad provision does not require proof of any mental state on the part of the debtor. *Id.*

WFC and Wenrick dispute the existence of all three elements required to be proven under this section of the UFTA. First, because of the nature of Dayton Title's account as a trust account holding third party escrow funds, WFC and Wenrick dispute whether Dayton Title possessed a property interest in the funds transferred to WFC and Wenrick. Second, they dispute Dayton Title's assertion that it received no reasonably equivalent value in exchange for the checks paid to WFC and Wenrick. Finally, WFC and Wenrick question whether the transfer left the title agency with an unreasonably small amount of assets. The court will discuss each of these elements below.

**1. Dayton Title has a "property interest" that was transferred through the checks paid to WFC and Wenrick**

As a threshold issue, the UFTA requires proof that the transfer involved a property interest of the debtor. Ohio Rev. Code § 1336.01(L) (defining "transfer" to include any direct or indirect, absolute or conditional, and voluntary or involuntary method of parting with a debtor's interest in an asset). This threshold issue arises in the context of both fraudulent and preferential transfers in bankruptcy. *See, e.g., In re Smith*, 966 F.2d 1527 (7th Cir.1992); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir.1987). In this case, Dayton Title asserts that it has legal title to and, therefore, a property interest in, the funds transferred to WFC and Wenrick. In opposition, WFC and Wenrick note that the escrow funds in the account belong to third parties and were only held in trust by Dayton Title. As

such, they argue that Dayton Title had no real property interest in the funds and, consequently, the funds are not recoverable for the benefit of the bankruptcy estate and its creditors.

■ In general, where a debtor's account is a mere conduit through which third party funds exchange hands, the debtor does not have a property interest recoverable for a bankruptcy estate as either a fraudulent or preferential transfer. *Chase & Sanborn*, 813 F.2d at 1181–1182. *See also McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389, 1395 (noting that a debtor has no interest in borrowed funds specifically earmarked by the lender for payment to a designated creditor even if the funds pass through the debtor's hand in getting to the selected creditor). This situation generally arises when a third party lends money to the debtor for the intended purpose of paying a selected creditor. *Montgomery*, 983 F.2d at 1394–1395; *Smith*, 966 F.2d at 1533. In such circumstances, the transfer of "earmarked" funds does not involve property of the debtor because: 1) the debtor never exercised control over the third party funds; and 2) the debtor's property was not diminished by the transfer. *Montgomery*, 983 F.2d at 1394–1395; *Smith*, 966 F.2d at 1533.

This case would present an earmarking situation if Chari's check had cleared. The parties intended the Dayton Title trust account to be a mere conduit through which the $5,000,000.00 deposited by Krishan Chari would be channeled to WFC and Wenrick. However, the situation is distinguished by the unfortunate fact that Chari's check was a forgery. The check, drawn on a non-existent account, had no real value. All subsequent checks deposited by Chari also bounced. As such, the effect of the transfer was not the chan-

neling of Chari's funds to WFC and Wenrick through Dayton Title's account.

Instead, Chari's fraudulent activities caused the unintended transfer of the following to WFC and Wenrick: 1) $742,848.62 in escrow funds held by Dayton Title in trust for the benefit of third parties and 2) approximately $4,142,151.38 from a provisional loan by National City Bank to Dayton Title needed to cover the overdraft created in the account after the escrow funds were exhausted. Because of the unique nature of this mistaken transaction involving the unintended transfer of escrow funds and a provisional loan rather than the intended transfer of Chari's funds, the court concludes that the transaction did involve a property interest of Dayton Title.

■ First, a debtor must exert control over funds transferred out of its account to demonstrate a property interest in them. *Montgomery*, 983 F.2d at 1394–1395 (noting that a debtor has a property interest in a bank's provisional loan, even if the loan is only an unauthorized extension of credit to cover an account overdraft created by kited checks, if the debtor exerts dominion and control over the funds); *Chase & Sanborn*, 813 F.2d at 1181; *Smith*, 966 F.2d at 1533. A debtor exercises control over funds when it makes the decision to use the funds to make a purchase or a payment to a creditor. *Montgomery*, 983 F.2d at 1395. When the debtor is not the entity directing the use of the funds, such as when borrowed funds are specifically earmarked for payment to a designated creditor, the funds are not within the debtor's control. *Id.*

WFC and Wenrick argue that because the escrow funds were to be paid out according to the direction of third parties who placed the funds in the trust account, Dayton Title had no control over the funds. They assert that Dayton Title's

lack of control over the funds is further supported by the fact that WFC and Wenrick were not creditors of Dayton Title when they received payment. For this proposition, they cite *Chase & Sanborn* in which the Eleventh Circuit notes that the presumption of a debtor controlling the payment of funds is not compelling when payment is to a non-creditor and the debtor receives no direct benefit from the transfer. 813 F.2d at 1181. In such circumstances, it is likely that the party providing the funds is controlling the transfer rather than the debtor. *Id.*

However, in this case, there is no question that the parties providing the funds did not control the transfer. Neither the third parties with escrow funds in the trust account nor National City Bank with its provisional loan of $4,142,151.38 directed payment of their funds to WFC and Wenrick. Instead, Dayton Title made the critical decision to write checks to WFC and Wenrick from the trust account, without waiting for Chari's $5,000,000.00 deposit to clear, thus setting in motion the provisional credit extended by National City Bank. The court concludes that by these acts, Dayton Title exerted clear control over the escrow funds and provisional loan from the bank.

■ Dayton Title's control over the transfer does not, by itself, establish a property interest in the funds. *Rieser v. Bruck Plastics Co.* (*In re Trinity Plastics, Inc.*), 138 B.R. 203, 208 (Bankr.S.D.Ohio 1992). As a second requirement, the transfer must diminish the value of the debtor's estate. *Id.; Montgomery,* 983 F.2d at 1394–1395; *Smith,* 966 F.2d at 1535–1536. This occurs if the transfer results in the depletion of funds generally available for distribution causing detriment to some or all of the debtor's creditors. *Chase & Sanborn,* 813 F.2d at 1181.

WFC and Wenrick argue that the funds in the trust account would never have been available for distribution to general unsecured creditors of Dayton Title. Therefore, the transfer of those funds to WFC and Wenrick did not effect the assets of Dayton Title's estate. Again, WFC and Wenrick would be correct about the effect of the transaction if it had occurred as planned resulting in the channeling of Chari's funds to WFC and Wenrick through Dayton Title's account. *See Chase & Sanborn,* 813 F.2d at 1181 (concluding that where third party funds simply pass through a debtor's possession without actually being property of the debtor, the transfer does not cause a depletion of the debtor's assets and the return of the money to the estate would create a windfall for creditors).

However, this is not the situation presented in this case. Because Chari's checks were forgeries with no value behind them, Dayton Title did not transfer Chari's funds. Instead, Dayton Title transferred the escrow funds of unrelated third parties and the funds loaned by National City Bank. This wrongful transfer of third party funds created $4,885,000.00 in new claims against Dayton Title that did not exist prior to the transfer. The newly created claims of the escrow account beneficiaries and National City Bank depleted the assets available to Dayton Title's other creditors. Thus, the transfer to WFC and Wenrick did diminish the Debtor's estate.

The court recognizes that in most circumstances involving a transfer of funds from an escrow account, the funds held in trust for third parties are not the debtor's property and are not recoverable by a debtor's estate as either a preference or fraudulent transfer. However, because of the unique circumstances of this case, the transfer from the account meets the two requirements establishing that Dayton Ti-

tle had a property interest in the funds. First, Dayton Title exerted control over the trust account funds by directing payment to WFC and Wenrick using the existing money in the account and National City Bank's provisional loan without waiting for Chari's check to clear. Second, the transfer created new claims against Dayton Title that did not exist prior to the transfer thus diminishing the amount of assets available to other creditors. For these reasons, the court concludes that a property interest of Dayton Title was transferred to WFC and Wenrick.

## 2. Dayton Title received no reasonably equivalent value in exchange for the transfer of funds to WFC and Wenrick

 In order to prevail on its fraudulent transfer claim under Ohio's UFTA, Dayton Title must further establish that it received nothing of reasonably equivalent value in exchange for the transfer of funds to WFC and Wenrick. Ohio Rev.Code § 1334.06(A)(2). To assess whether a challenged transfer is supported by reasonably equivalent value, "courts generally compare the value of the property transferred with the value of that received in exchange for the transfer." *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 707 (6th Cir.1999). It is not necessary for there to be "mathematical precision" or a "penny-for-penny" exchange in order to establish reasonably equivalent value. *Coan v. Fleet Credit Card Services, Inc.* (*In re Guerrera*), 225 B.R. 32, 36 (Bankr. D.Conn.1998). However, courts should keep the equitable purposes behind fraudulent transfer law in mind, recognizing that any significant disparity between the value received and the value surrendered will significantly harm innocent creditors. *Id.*

Dayton Title demonstrated that the transfer created a negative balance in its trust account and $4,885,000.00 in claims against Dayton Title that did not exist prior to the transfer.[2] In exchange, Dayton Title asserts that it received nothing of value from WFC and Wenrick. WFC and Wenrick disagree noting that they deposited a total of $4,800,000.00 in Dayton Title's trust account on September 3, 1999 representing the proceeds from their final bridge loans to Invesco. They argue that no documentary evidence supports that Dayton Title disbursed that money. Thus, the funds they initially deposited constitute reasonably equivalent value to what they received in the transfer.

If Dayton Title failed to disburse the $4,800,000.00 in loan proceeds received from WFC and Wenrick, this could amount to reasonably equivalent value for Dayton Title's $4,885,000.00 loss. However, in response to WFC and Wenrick's argument, Dayton Title submits evidence, in the form of Pam Folino's affidavit, bank records and Dayton Title's Escrow Account Ledgers, demonstrating that the loan proceeds from WFC and Wenrick were, in fact, disbursed. [Adv.Doc. # 136-1, Folino Aff. attached at Ex. B and attached Exs. 1–6.] The $3,200,000.00 in Invesco loan proceeds which Dayton Title received from WFC on September 3, 1999

**2.** With respect to whether Dayton Title received reasonably equivalent value for the transfer, WFC and Wenrick again argue that the Debtor's estate experienced no loss as a result of the transfer of funds from the trust account because the funds belong to third parties. As noted previously, the wrongful transfer of those funds, as well as the transfer of the provisional loan from National City Bank, created $4,885,000.00 in new claims against Dayton Title that would not exist except for the transfer to WFC and Wenrick. Consequently, the court rejects WFC and Wenrick's continued argument that the transfer did not effect Dayton Title's net worth.

was wire transferred from the trust account to John Lewis on the same day. [*Id.*, Folino Aff. and attached Exs. 1 and 2.] In addition, Dayton Title disbursed the $1,600,000.00 in Invesco loan proceeds received in two wire transfers from Wenrick as follows: 1) $1,500,000.00 to John Lewis; 2) $34,000.00 to McDuffie Construction Management Group; and 3) $66,000.00 to Invesco. [*Id.*, Folino Aff. and attached Exs. 3–6.] WFC and Wenrick have provided no evidence to contradict these facts. Because Dayton Title retained none of the funds loaned to Invesco by WFC and Wenrick, the loan proceeds do not constitute reasonably equivalent value for Dayton Title's loss.

Next, WFC and Wenrick request the court to consider indirect benefits received by Dayton Title as reasonably equivalent value. WFC and Wenrick note the significant value Dayton Title placed on its business relationship with Chari. Even before the transactions with WFC and Wenrick, Dayton Title allowed Chari to have substantial extensions of credit by floating returned checks with other funds in the trust account in exchange for Chari's continued business. They assert that the transaction involving WFC and Wenrick, channeled through the trust account, enabled Dayton Title to facilitate this business relationship with Chari believed to be financially advantageous.

■ WFC and Wenrick are correct that courts should analyze both direct and indirect benefits to a debtor in determining whether reasonably equivalent value has been received. *Enwotwen Indus., Inc. v. Brookstone Limited Partnership (In re Newtowne )*, 157 B.R. 374, 378 (Bankr. S.D.Ohio 1993). However, the economic value of any indirect benefits must be fairly concrete and quantifiable to merit consideration by the court. *SPC Plastics Corp. v. Griffith (In re Structurlite Plas-*

*tics Corp.*), 224 B.R. 27, 31 (6th Cir. BAP 1998) (noting that the speculative value of indirect benefits like the opportunity to acquire additional loans or new managerial talent does not constitute fair consideration); *Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's Inc.)*, 188 B.R. 832, 843 (Bankr.D.Minn.1995) (noting that the defendant-creditors carry "the burden of production as to the concreteness of the indirect benefit, and its reasonable equivalence of value.").

While goodwill and the continuation of business relationships can be indirect benefits to a business debtor, WFC and Wenrick have not attempted to measure or quantify the economic value of Dayton Title's continued relationship with Chari. Instead, they only speculate, without evidentiary support, that the value of Dayton Title's ongoing relationship with Chari is reasonably equivalent to the $4,885,000.00 loss experienced by Dayton Title forcing it to close its doors and seek bankruptcy protection. The court finds this assertion too speculative to merit consideration. Consequently, the court concludes Dayton Title received no reasonably equivalent direct or indirect benefit for the $4,885,000.00 transfer to WFC and Wenrick.

### 3. The Transfer Left Dayton Title with An Unreasonably Small Amount of Assets in Relation to the Transaction

■ The third requirement under Ohio's UFTA, requires Dayton Title to demonstrate that the debtor engaged in a transaction "for which the remaining assets of the debtor were unreasonably small in relation to . . . the transaction[.]" Ohio Rev.Code § 1336.04(A)(2)(a). The unreasonably small asset theory under this provision is the broadest kind of fraudulent conveyance claim applying when the "debt-

or is left with unreasonably small assets, compared to his historical level of assets or cash flow and current needs." *Aristocrat Lakewood Nursing Home v. Mayne,* 133 Ohio App.3d 651, 668, 729 N.E.2d 768, 780 (Ohio Ct.App.1999). Care must be taken, however, not to invalidate "all transfers simply because a debtor subsequently happened to encounter financial problems." *Id.*

Dayton Title's financial problems did not simply occur as a coincidence after the transfer to WFC and Wenrick. Its problems were a direct result of the transfer of funds from the trust account creating $4,885,000.00 in new claims against Dayton Title that did not exist prior to the transfer. The transfer not only depleted Dayton Title's assets, but left it unable to continue in business. The court concludes that the transfer of funds left Dayton Title with unreasonably small assets, so that Dayton Title meets this final element of a fraudulent conveyance under Ohio's UFTA.

### D. Prejudgment Interest, Costs and Attorney Fees

Upon prevailing on its motion for summary judgment, Dayton Title asserts that the estate should be entitled to costs, attorney fees and interest on the award, at a rate of 10% per annum, calculated from October 19, 1999, the date of the fraudulent transfer to WFC and Wenrick. WFC and Wenrick do not respond to Dayton Title's request in their memoranda.

With respect to prejudgment interest, the Bankruptcy Code does not address such an award in actions to avoid fraudulent transfers. In the absence of a statutory prohibition, a trial court may exercise its discretion to award prejudgment interest taking into consideration the relative equities of the parties and the need to fully compensate the debtor's es-

tate for the use of funds for the period of time they were withheld from the estate. *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 1005–1006 (Bankr.S.D.Ohio 1990). The good faith dispute over the funds being property of the estate does not warrant a different result. *Hunter v. Patton (In re Patton )* 200 B.R. 172, 178 (Bankr. N.D.Ohio 1996). For these reasons, the court will award Dayton Title prejudgment interest to compensate the estate for its loss of the use of the funds transferred to WFC and Wenrick while this litigation proceeded.

Although Dayton Title requests prejudgment interest to run from the date of the transfer to WFC and Wenrick, prejudgment interest is generally awarded from the date of the demand on the defendants or, absent this, the date the adversary proceeding was filed. *Suburban Motor Freight,* 124 B.R. at 1006. In this case, Dayton Title provides no demand date. Thus, the court concludes that the appropriate date for the accrual of prejudgment interest to begin is the date the adversary proceeding was initiated.

In conclusion, the court grants prejudgment interest to the Plaintiff, Dayton Title, running from the date the adversary complaint was filed on November 10, 1999. The applicable rate of interest shall be the rate set forth in 28 U.S.C. § 1961(a). *See Id.* at 1006; *Hunter v. Patton (In re Patton ),* 200 B.R. at 178; *Sicherman v. Jelm (In re Harvard Manufacturing Corp.),* 97 B.R. 879, 884 (Bankr.N.D.Ohio.1989).

Furthermore, Plaintiff Dayton Title is awarded court filing costs. The court deems an award of attorney fees or other costs to the Plaintiff to be inappropriate.

### CONCLUSION

The court grants partial summary judgment to Defendants The White Family

Companies, Inc. and Nelson Wenrick with respect to Dayton Title Agency, Inc. Business Trust's ineligibility for separate bankruptcy protection from Dayton Title Agency, Inc.

The court grants summary judgment to Plaintiff Dayton Title Agency, Inc., as Debtor–in–Possession, on its claim for recovery of the $3,260,000.00 transferred to Defendant The White Family Companies, Inc. and the $1,625,000.00 transferred to Defendant Nelson Wenrick under 11 U.S.C. § 544 and Ohio Rev.Code § 1336.04.[3] Summary judgment to Defendants on the same issue is hereby denied.

The Plaintiffs are entitled to only one recovery from WFC and Wenrick. Therefore, the court deems National City Bank's motion for summary judgment to be moot. For this reason, the court need not reach National City Bank's separate claims for recovery nor the Defendants' separate defenses to recovery by the bank.

The court awards prejudgment interest to Plaintiff Dayton Title Agency, Inc. from November 10, 1999 at the rate prescribed in 28 U.S.C. § 1961(a) and court filing costs.

**It is so ordered.**

---

**3.** The court, having concluded that Dayton Title is entitled to recovery under Ohio Rev. Code § 1336.04, will not address Dayton Title's alternative claim for recovery of the fraudulent transfers under Bankruptcy Code § 548.