**THE WHITE FAMILY COMPANIES, INC., et al., Appellants/Cross–Appellees,**

v.

**DAYTON TITLE AGENCY, INC., et al., Appellees/Cross–Appellants.**

**No. C–3–01–481.**

United States District Court, S.D. Ohio, Western Division.

Sept. 27, 2002.

240

Ronald Stephen Pretekin, UU, Beth A. Buchanan, Coolidge, Wall, Womsley & Lombard, Roger John Makley, Dayton, OH, for Appellants.

Anne Marie Frayne, Jacob Alfred Myers, Myers & Frayne Co., LPA, Dayton, OH, Terry Morrow Miller, David Stewart Cupps, Vorys Sater Seymour & Pease, Columbus, OH, for Appellees.

Michael S Karaman, Steven Karl Dankof, Weisbrod & Dankof, Dayton, OH, for Amicus.

OPINION AFFIRMING IN PART AND VACATING IN PART DECISIONS OF THE UNITED STATES BANKRUPTCY COURT; CAPTIONED CAUSE REMANDED TO THE UNITED STATES BANKRUPTCY COURT; TERMINATION ENTRY

RICE, Chief Judge.

In this appeal, the parties challenge a number of orders entered by United States Bankruptcy Judge William Clark, during the course of an adversary proceeding. Appellee/Cross–Appellant Dayton Title Agency, Inc. ("DTA"), filed the bankruptcy case which spawned the adversary proceeding. DTA's bankruptcy arose out of its involvement with Krishan Chari ("Chari"), an aspiring real estate magnate

with few scruples, and his related entity, The Chari Group, Ltd.[1] DTA was owned equally by two shareholders, Alex Katona ("Katona") and Brenda Rupert ("Rupert"). Rupert was Chari's primary contact at DTA.

The adversary proceeding was initiated by DTA; Dayton Title Agency, Inc., Business Trust ("DTABT"); and National City Bank ("NCB") against the Appellants/Cross–Appellees, The White Family Companies, Inc. ("White"), and Nelson D. Wenrick ("Wenrick").[2] DTA, DTABT and NCB requested that the Bankruptcy Court set aside, as fraudulent under § 1336.04 of the Ohio Revised Code and preferential under 11 U.S.C. § 548, transfers of $3,260,000, and $1,625,000 to White and Wenrick, respectively.[3] Shortly after the adversary proceeding had been initiated, the Appellants requested that Judge Clark stay proceedings until the state criminal prosecution of Chari had been completed. He refused that request. In addition, shortly before Judge Clark was to hear oral argument on fully briefed cross motions for summary judgment, that judicial officer denied Appellants request to re-open discovery. During the course of the adversary proceeding, Judge Clark denied the Appellants' request to disqualify counsel representing DTA, and the latter's request to disqualify counsel representing Appellants.

In his Decision of May 15, 2001, Bankruptcy Judge William Clark summarized the facts and circumstances giving rise to the adversary proceedings:

Beginning in November of 1998, Dayton Title experienced difficulties collecting funds from Chari to cover disbursements made at his direction through the trust accounts. In at least one transaction, Dayton Title disbursed funds on behalf of Chari before Chari made a deposit into its account. [Adv.Doc. # 129–1, Ex. 3.] In connection with this same transaction and many others, Chari's checks were returned for insufficient funds. [*Id.*, Exs. 3, 5, 11–18, 20–21, 23–24.] Some of the bounced checks resulted in substantial overdrafts in a Dayton Title trust account. [Adv.Doc. # 130–1, Ex. 70 at NCB 00277 and Adv. Doc. # 131–1, Ex. 71 at NCB 00255.]

At the center of the present dispute are transactions conducted at Chari's direction through one of Dayton Title's trust accounts with National City Bank involving Chari's real estate investment enterprise, Invesco, LLC. [Folino Depo., pp. 27–28.] Invesco was run by Chari and his partner Michael Karaman. [*Id.*] Beginning in December of 1998, two separate entities, the White Family Companies, Inc. ("WFC")[,] and Nelson Wenrick ("Wenrick") provided short term financing, called bridge loans, to

1. Both Chari and his related entity was forced into bankruptcy in 1999. Chari later plead no contest and was convicted in the Montgomery County Common Pleas Court of 36 counts of racketeering, fraud and forgery relating to his real estate ventures and his work as a real estate agent. He was sentenced to eight years of incarceration. In addition, Chari entered a guilty plea to a count of fraud and was sentenced to an additional year of incarceration in a prosecution in this Court. *See United States v. Chari*, Case No. CR–3–01–030.

2. Although White and Wenrick are Appellants and Cross–Appellees, the Court will, for sake of convenience, refer to them as "Appellants."

3. Section 1336.04 is applicable in a bankruptcy proceeding pursuant to 11 U.S.C. § 544(b), which authorizes a trustee to set aside any transfer of an interest of the debtor in property that is voidable under state law. *In re Fordu*, 201 F.3d 693, 697 n. 3 (6th Cir.1999). When, as in the instant case, no trustee has been appointed, a debtor-in-possession, such as DTA, possesses all of the powers and duties of a trustee. 11 U.S.C. § 1107(a).

Invesco for purported real estate transactions. [Adv.Doc. # 52–1, Depo. of Timothy White ("White Depo."), pp. 28–30; Adv.Doc. # 53–1, Depo. of Nelson Wenrick ("Wenrick Depo."), pp. 14–29.] The purpose of the loans, each involving over one million dollars, was to facilitate Invesco in the purchase of commercial real estate for attractive prices. [White Depo., p. 30; Adv.Doc. # 132–1, Ex. 95.] The duration of each loan was only 30 or 45 days, long enough for Invesco to procure permanent financing. [Adv.Doc. # 90–1, Depo. of Dave Alexander ("Alexander Depo."), p. 148; White Depo., pp. 30, 34–36; Wenrick Depo., p. 29.] These loan transactions were usually closed at Dayton Title's facilities [Alexander Depo., pp. 34–35, 53, 68, 87–88, 101, 113; Wenrick Depo., p. 16] and were evidenced by notes signed by Michael Karaman on behalf of Invesco [Adv.Doc. # 132–1, Ex. 95]. Each note carried a second signature of Michael Karaman as personal guarantor. [*Id.*]

Between December 1, 1998 and July 12, 1999, WFC made five bridge loans to Invesco ranging from $1,900,000.00 to $3,200,000.00. [*Id.*] In a completely separate transaction, Wenrick furnished a $1,200,000.00 bridge loan to Invesco on August 4, 1999. [*Id.*] Each loan transaction was carried out by the lender depositing the funds into one of Dayton Title's accounts. [Adv.Doc. # 132–1, Exs. 99–103, 105.] These loans were paid back in fall, but not always before the due dates. [Adv.Doc. # 132–1, Ex. 95; Adv.Doc. # 103–1, Exs. G, N, T, AA, GG; Wenrick Depo., pp. 235–236.]

On September 3, 1999, WFC and Wenrick each provided a final bridge loan to Invesco of $3,200,000.00 and $1,600,000.00 respectively. [Adv.Doc. # 132, Ex. 95.] The loans were made in connection with the supposed purchase of property containing a Staples retail office supply store. [Wenrick Depo., pp. 242–244; White Depo., pp. 144–145.] Like the previous loans, these were evidenced by notes containing Michael Karaman's signature as President of Invesco and a second signature of Michael Karaman as personal guarantor of the loans. [Adv.Doc. # 132–1, Ex. 95.] According to the notes, Invesco was to repay the principal and interest on the short-term loans on or before October 3, 1999. [*Id.*]

Soon after the loans were past due, WFC and Wenrick were repaid with checks drawn on a Texas IOLTA account of John Lewis. [Adv.Doc. # 103–1, Ex. OO; Alexander Depo., pp. 118–119; Wenrick Depo. pp. 24–25.] Both checks were returned for insufficient funds. [Wenrick Depo. pp. 24–25; Alexander Depo., pp. 122–123.]

Subsequently, on October 19, 1999, Krishan Chari had a $5,000,000.00 check deposited into Dayton Title's trust account with National City Bank for the purpose of paying WFC and Wenrick. [Adv.Doc. # 99–1, App. A, Ans. to Interrog. 3(c); Adv.Doc. # 132–1, Exs. 97 and 98.] The check was purportedly drawn on a DCW Investments account at Oak Hill Bank. [*Id.*] The teller at National City Bank did not place a hold on the check Chari deposited. [Adv.Doc. # 132–1, Ex. 109.] On that same day, pursuant to Chari's instructions, Dayton Title issued a check payable to WFC in the amount of $3,260,000.00 and a check payable to Wenrick in the amount of $1,625,000.00 from the trust account. [Adv.Doc. # 103–1, Ex. 2, Affidavit of Pam Folino ("Folino Aff."), ¶ 4; Adv.Doc. # 132–1, Ex. 111.] The remaining $115,000.00 from Chari's $5,000,000.00 check was to remain in Dayton Title's trust account for fees payable to Dayton Title for unrelated transactions. [Folino Aff., ¶ 4.]

On October 20, 1999, Tim White presented the WFC check to a teller at National City Bank and obtained an official bank check in return. [White Depo., pp. 154–155; Adv.Doc. # 99–1, App. A., Ans. to Interrog. 3(a).] Wenrick deposited his check in an account at Security National Bank. [Wenrick Depo., pp. 39–45.] Wenrick's check cleared the trust account at National City Bank on October 25, 1999. [Adv.Doc. # 99–1, App. A., Ans. to Interrog. 3(b).]

On or about October 26, 1999, National City Bank received notification that the check deposited by Chari in Dayton Title's trust account was being returned. [Adv.Doc. # 132–1, Ex. 97.] However, WFC and Wenrick's checks were honored by National City Bank prior to the bank's discovery that Chari's check was a forgery drawn on a non-existent account. [Adv.Doc. # 99–1, App. A, Ans. to Interrog. 3(a) through 3(c), 5 and 6.] Chari deposited two subsequent $5,000,000.00 checks into Dayton Title's trust account which also bounced. [Adv. Doc. # 131–1, Ex. 79; Adv.Doc. # 132–1, Exs. 97 and 118.] Consequently, National City Bank made the decision to freeze Dayton Title's accounts on November 4, 1999. [Adv.Doc. # 132–1, Ex. 119.]

Because Chari's checks were returned, the funds in Dayton Title's trust account did not cover the checks written to WFC and Wenrick that were already honored by National City Bank. This chain of events caused Dayton Title's trust account to be substantially overdrawn. According to an account statement, Dayton Title had a negative balance of $4,142,151.38 in the trust account as of November 19, 1999 [Adv.Doc.

# 131–1, Ex. 80][,] indicating that approximately $742,848.62 of the funds transferred to WFC and Wenrick represent money that had been in Dayton Title's trust account at the time of the conveyance. No party disputes that the funds in the account represent third party escrow funds held in trust by Dayton Title. [Adv.Doc. # 129–1, Ex. 2; Folino Depo., pp. 17–18.]

*In re Dayton Title Agency, Inc.*, 262 B.R. 719, 723–25 (Bkrtcy.S.D.Ohio 2001).

In that decision, Judge Clark concluded that DTABT was not eligible to file bankruptcy and, therefore, entered judgment in favor of the Appellants in the adversary proceeding initiated by DTABT. *Id.* at 726–27. In addition, that judicial officer concluded that DTA was entitled to summary judgment on its claim under § 1336.04, holding that the checks received by Appellants from DTA's trust account constituted fraudulent conveyances, and, contemporaneously overruled Appellants' motion for summary judgment on that claim.[4] *Id.* at 727–33. Judge Clark also concluded that DTA was entitled to recover prejudgment interest and costs and that NCB's claims were moot. *Id.* at 733–34.

Thereafter, the Appellants sought reconsideration and requested that Judge Clark reopen discovery. In particular, the Appellants requested the opportunity to depose Chari, who had previously refused to answer questions, relying upon his Fifth Amendment privilege. Judge Clark afforded the Appellants the opportunity of deposing Chari, who once again refused to answer questions, relying upon his privilege under the Fifth Amendment. In addition, Judge Clark conducted a hearing, during which he afforded Appellants the opportunity of eliciting testimony from

---

**4.** Since he had concluded that DTA was entitled to summary judgment on its claim under § 1336.04, Judge Clark found it unnecessary to address DTA's claim under 11 U.S.C. § 548. 262 B.R. 734 n. 3.

John Rieser ("Rieser"), who, as the Trustee for the bankruptcies of Chari and his related entity, had investigated their financial affairs.[5] In his decision of November 6, 2001, Judge Clark denied the Appellants' request for reconsideration and to reopen discovery.

Appellants, White and Wenrick, have appealed many of the decisions entered by Judge Clark through the course of the adversary proceeding. In addition, DTA and DTABT have filed a cross appeal. The Appellants present twenty-three Assignments of Error, while DTA and DTABT present two Assignments of Error. As a means of analysis, the Court will initially rule upon the assignments set forth in Appellants' appeal, following which it will turn to those which have been presented in that of DTA and DTABT.

### A. Appellants' Appeal

As is indicated, the Appellants have presented twenty-three Assignments of Error. As a means of analysis, the Court will address the Appellants' Assignments of Error in the order in which they have been presented, discussing related arguments together.

### I. The Bankruptcy Court Erred in its July 19, 2000, Order in Failing to Disqualify Counsel for DTA (First Assignment of Error)

As is indicated, Katona and Rupert each own 50% of DTA's shares. For a number of years, DTA has been represented by Myers & Frayne Co., L.P.A., which has represented it in the bankruptcy and in the adversary proceeding. At some point after Chari's house of cards had collapsed, Myers & Frayne conducted legal research into the ability of DTA to dis-

charge Rupert, as its director, officer and employee. As a consequence, Appellants moved to disqualify Myers & Frayne, as well as the individual attorneys employed by that law firm from representing DTA in the adversary proceeding, alleging that, by conducting the research, Myers & Frayne had chosen to represent DTA and Katona, one of the 50% owners of DTA, thus creating a conflict of interest with Rupert, the other 50% owner of DTA. The Appellants did not contend that they had been affected by that asserted conflict. Thus, stated somewhat differently, the Appellants, who were not involved in the asserted conflict of interest affecting Myers & Frayne, sought to have that law firm disqualified from representing DTA in the adversary proceeding, because Myers & Frayne had chosen to represent one of that corporation's 50% owners, rather than both as co-owners of DTA. Judge Clark, after having conducted a hearing, denied Appellants' request to disqualify DTA's counsel. Before this Court, the Appellants argue that Judge Clark erred in failing to disqualify Myers & Frayne and the individual attorneys employed by that law firm. Since the Appellants have failed to demonstrate that they have standing to seek disqualification of DTA's counsel (given that they have not been affected by the conflict of interest Myers and Frayne are allegedly laboring under), this Court overrules the Appellants' First Assignment of Error.

In *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir.1976), the Fifth Circuit affirmed the decision of the District Court to deny the motion of one defendant to disqualify plaintiff's counsel because that counsel had previously advised another defendant which had been dismissed from the litigation. In conclud-

---

5. The purpose of that hearing was to determine whether there existed newly discovered evidence, which would justify granting Appel-

lants' request for reconsideration. Judge Clark ultimately struck portions of Rieser's testimony.

ing that the moving defendant was without standing to seek disqualification of plaintiff's counsel on the basis of his prior representation of a co-defendant, the Fifth Circuit noted that, "[a]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *Id.* at 88. The Fifth Circuit indicated that such a rule was necessary, because "[t]o allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist." *Id.* at 90. In *O'Connor v. Jones*, 946 F.2d 1395 (8th Cir.1991), the plaintiff moved to disqualify defendant's counsel, arguing that they had been improperly retained. The plaintiff did not claim that defendant's counsel had previously represented him. The Eighth Circuit affirmed the District Court's denial of that motion, concluding that the plaintiff was without standing to seek disqualification. *Accord, Doe v. Lee*, 178 F.Supp.2d 1239 (M.D.Ala.2001) (indicating that plaintiff lacked standing to move to disqualify defendant's attorney on grounds that attorney's wife was material witness); *Colyer v. Smith*, 50 F.Supp.2d 966 (C.D.Cal.1999) (holding that plaintiff was without standing to seek disqualification of defendant's counsel on the basis of purported breach of duty to a third party). This Court finds the foregoing decisions to be persuasive and, in the absence of contrary authority from the Sixth Circuit, will follow same. Therefore, the Court turns to the question of whether Appellants have demonstrated that they have standing to seek the disqualification of Myers & Frayne as DTA's counsel, because of that law firm's alleged conflict of interest with Rupert.

█ It is axiomatic that the irreducible constitutional minimum of standing con-

tains three elements: first, plaintiff must have suffered an injury in fact, i.e., invasion of legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical; second, there must be causal connection between injury and conduct complained of, i.e., injury has to be fairly traceable to challenged action of defendant, and not result of independent action of some third party not before court; and third, it must be likely, as opposed to merely speculative, that injury will be redressed by favorable decision. *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir.2002). Herein, the Appellants have not demonstrated that they have suffered an injury in fact, as a result of the conflict of interest under which Myers & Frayne is allegedly proceeding in its representation of DTA.

2. *The Bankruptcy Court Erred in its July 19, 2000, Order in Failing to Impose Sanctions Against DTA and Counsel for DTA (Second Assignment of Error)*

█ During the course of the Adversary Proceeding, DTA moved to disqualify Appellants' counsel, Coolidge, Wall, Womsley & Lombard ("Coolidge, Wall"). That motion was denied, as was the Appellants' request, in accordance with Bankruptcy Rule 9011, that the Bankruptcy Court impose sanctions on DTA and its counsel for having filed a frivolous motion. With their Second Assignment of Error, the Appellants challenge Judge Clark's decision to refuse to impose sanctions. This Court reviews the decision of the Bankruptcy Court to deny the request for sanctions under an abuse of discretion standard. *In re Downs*, 103 F.3d 472, 480 (6th Cir.1996). DTA moved to disqualify Coolidge, Wall, arguing that it had violated DR 7–104(A), by interviewing Rupert without notifying its counsel in advance. Coolidge, Wall, relying upon Advisory Opinion 96–001

from the Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court, argued that its interview of Rupert had not violated DR 7–104(A).

Herein, the Appellants have not demonstrated that Judge Clark abused his discretion, by failing to impose sanctions under Bankruptcy Rule 9011 on DTA and its counsel for filing the motion to disqualify Coolidge, Wall. Rule 9011(b), which is identical to Rule 11(b) of the Federal Rules of Civil Procedure, provides:

(b) *Representations to the court.* By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Although Appellants do not expressly so state, it is apparent that they contend that DTA's motion to disqualify was frivolous under Rule 9011(b)(2), since they do not argue that the motion was presented for an improper purpose or that the factual contentions supporting it lacked evidentiary support. The Appellants contend that DTA's motion was frivolous, because Rupert was a former employee of DTA when Coolidge, Wall interviewed her. Appellants point out that Advisory Opinion No. 96–001 and decisions from states other than Ohio have concluded that DR 7–104(A) is not violated when an attorney, who represents a client with interest adverse to a corporation, interviews a former employee of that corporation. In pertinent part, DR 7–104(A) provides that it is unethical for an attorney to communicate with a party he knows to be represented by another attorney, unless he has the prior consent of the other attorney. DR 7–104(A) does not explicitly address the question of whether an attorney violates that rule, by interviewing a former employee of a corporation. In resolving that question, Judge Clark was obligated to apply federal law. *In re Snyder,* 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985) (noting that federal law controls the ethical standards of attorneys appearing in federal court). In the absence of authority from the Sixth Circuit, holding an attorney did not violate DR 7–104(A) by interviewing a former employee of a corporation, without giving advance notification to or obtaining permission from the corporation's counsel, this Court concludes that Judge Clark did not abuse his discretion by refusing to impose sanctions on DTA and its counsel, pursuant to Rule 9011(b)(2).

Based upon the foregoing, the Court overrules the Appellants' Second Assignment of Error.

*3. Challenges to Judge Clark's Procedural Rulings (Third, Fourth and Eighth Assignments of Error)*

With their Third, Fourth and Eighth Assignments of Error, the Appellants chal-

lenge certain procedural rulings made by Judge Clark during the course of the adversary proceeding. In particular, the Appellants raise the following issues, to wit:

3. Whether the court erred in its December 17, 1999, order in denying a stay of adversary proceedings until the resolution of state criminal proceedings relating to the accounts, transactions, and conduct at issue in the adversary proceeding.[6]

4. Whether the court erred in its April 12, 2001, order in failing to reopen discovery in the adversary proceeding.

8. Whether the court erred in its August 2, 2001, order to the extent that the court limited Defendants' ability to procure and [to] submit evidence for consideration beyond that which might be provided by the deposition of Krishan Chari in support of [Appellants'] Motion for Reconsideration.

Doc. # 16 at 2–3.

■■ Appellate courts have recognized that a bankruptcy court enjoys broad discretion in the control of discovery in proceedings occurring in that court. *See Brandt v. Wand Partners*, 242 F.3d 6, 18 (1st Cir.2001); *In re Valley–Vulcan Mold Company*, 5 Fed.Appx. 396, 2001 WL 224066 (6th Cir.2001). Bankruptcy courts also enjoy broad discretion in matters of pretrial management, scheduling, and docket control, and will be reversed in such matters only if the reviewing court is convinced that the court made a clear error in judgment. *See Knoll v. American*

*Tel. & Tel. Co.*, 176 F.3d 359, 362–63 (6th Cir.1999). The Sixth Circuit will not interfere with a lower court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant. *See In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir.1996).

Herein, the Appellants have not convinced this Court that Judge Clark abused his discretion by refusing to stay the adversary proceeding pending resolution of the state criminal charges against Chari, by refusing to reopen discovery and by refusing to permit the Appellants to procure and to submit additional evidence to support their request for reconsideration, other than Chari's deposition. Accordingly, the Court overrules the Appellants' Third, Fourth and Eighth Assignments of Error.

### 4. Hearing of July 9, 2001 (Fifth through Seventh Assignments of Error)

■ On July 9, 2001, Judge Clark conducted an oral and evidentiary hearing on the Appellants' request for reconsideration. During that evidentiary hearing, Rieser was permitted to testify; however, Judge Clark struck portions of his testimony. In particular, Judge Clark struck Rieser's conclusory testimony that certain transactions constituted check kiting.[7] The Appellants have assigned the following errors arising out of Judge Clark's rulings during that hearing, to wit:

---

6. With this Assignment of Error, the Appellants argue that Judge Clark erred by refusing to stay proceedings pending resolution of the state criminal proceedings against Chari.

7. Rieser was testifying about what occurred with the money which White and Wenrick had given to DTA, as part of their last bridge loans to Chari. Rieser explained that he had learned from his investigation that the money was transferred by wire to the trust account

of a Texas attorney who had represented Chari. The money was then used to cover two checks the attorney had previously written to Miami Valley Title. The money from the Texas attorney's two checks was used to pay White and Wenrick for their previous bridge loans to Chari. Thus, Rieser referred the transfer of funds as a check kiting scheme.

5. Whether the court erred in the July 9, 2001, hearing to the extent that it excluded the testimony of John Rieser, ..., as to the nature of transactions involving the [DTA trust] and affecting funds in which [Appellants] had an interest.

6. Whether the court erred in the July 9, 2001, hearing to the extent that it excluded testimony of Trustee Rieser as to the value created by the funds furnished by [Appellants].

7. Whether the court erred in the July 9, 2001, hearing to the extent that it excluded exhibits submitted by [Appellants] relating to and in support of Trustee Rieser's testimony.

Doc. # 16 at 2–3. This Court applies an abuse of discretion standard of review to Judge Clark's evidentiary rulings. *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir.2002). A bankruptcy court is considered to have abused its discretion when a reviewing court is "left with the definite and firm conviction that the [bankruptcy] court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (quoting *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir.2000)). *See also, United States v. Spikes*, 158 F.3d 913, 927 (6th Cir.1998) ("A trial court abuses its discretion 'when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.'" *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir.1985)), *cert. denied*, 525 U.S. 1086, 119 S.Ct. 836, 142 L.Ed.2d 692 (1999). In addition, the Appellants must demonstrate that they were prejudiced by Judge Clark's evidentiary rulings. *Varga v. Rockwell International Corp.*, 242 F.3d 693, 701 (6th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 53, 151 L.Ed.2d 23 (2001).

■ This Court cannot conclude that Judge Clark abused his discretion in any of his evidentiary rulings. With their Fifth and Sixth Assignments of Error, the Appellants focus on Judge Clark's decision to strike, on a number of occasions, Rieser's labeling as "check kiting," the transfer of funds which they provided to Chari, through DTA, with their last bridge loans. Judge Clark allowed Rieser to testify about the facts he had learned from his investigation into Chari's financial transactions. The Appellants have cited no authority to support their proposition that a judicial officer is required to permit a witness to testify in conclusory fashion, by using "buzz phrases." Moreover, even if Judge Clark erred by striking Rieser's use of the phrase "check kiting" or "kiting," the Appellants have not argued that they suffered prejudice as a result, much less demonstrated same.

■ With their Seventh Assignment of Error, the Appellants argue that Judge Clark abused his discretion in refusing to admit a document entitled "Greetings from Hell." That document is a typed message, addressed to the "Dayton Title gang," with Chari's first name appearing at the bottom. One could argue that this document demonstrates that there was some sort of understanding between Chari and DTA, relating to the former's criminal activity. Judge Clark excluded this document, which was Exhibit 23 during the July 9th hearing, concluding that Appellants had failed to prove that it was authentic. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a). Further, evidence may be authenticated through the testimony of a witness with knowledge "that a matter is what it is claimed to be." Fed.R.Evid.

901(b)(1). Herein, the Appellants presented testimony from an individual, Collins, who indicated that Katona had told him (Collins) that Chari had sent him (Katona) a letter and that he subsequently received Exhibit 23 from Katona. Since Collins did not have personal knowledge of the source of Exhibit 23, this Court concludes that Judge Clark did not abuse his discretion by excluding that document from evidence.

Based upon the foregoing, the Court overrules the Appellants' Fifth through Seventh Assignments of Error.

5. *Evidentiary and Procedural Rulings in Decision of November 6, 2001, Denying Appellants' Request for Reconsideration (Ninth through Eleventh Assignments of Error)*

On November 6, 2001, Judge Clark issued his decision, denying the Appellants' request for reconsideration. With their Ninth through Eleventh Assignments of Error, the Appellants take issue with three of Judge Clark's evidentiary and procedural rulings in that decision, to wit:

9. Whether the court erred in its November 6, 2001, Decision and Order Striking in Part [Appellants'] Supplemental Memorandum, in striking evidence, including the letter of Brenda Rupert, presented in support of [Appellants'] Motion to Reconsider.

10. Whether the court erred in its November 6, 2001, decision and order in failing to consider evidence of the conduct of Brenda Rupert in the court's reconsideration of the claims and transactions at issue.

11. Whether the court erred in its November 6, 2001, decision and order in failing to reopen discovery.

Doc. # 16 at 3. As is indicated above, this Court applies an abuse of discretion standard of review to Judge Clark's evidentiary and procedural rulings. The Court concludes that the Appellant has failed to demonstrate that Judge Clark abused his discretion in any of those regards. With respect to striking the letter allegedly authored by Rupert, the Appellant offered no evidence, demonstrating that the letter was authentic (i.e., that Rupert actually wrote it). With their Tenth Assignment of Error, the Appellants decry Judge Clark's failure to draw an adverse inference to DTA, as a result of Rupert's invocation of her Fifth Amendment privilege and concomitant refusal to answer questions during her deposition. The Appellants have failed to identify the part of the massive record in this appeal, in which they requested that Judge Clark draw such an inference and where that judicial officer refused such a request. Moreover, even if Appellants had pointed to the part of the record where they requested that such an inference be drawn and Judge Clark refused that request, the Court would reject their contention that it was an abuse of discretion to refuse to draw such an adverse inference. The Appellants do not contend that Judge Clark should have drawn an adverse inference, merely because Rupert refused to answer questions during her deposition. Rather, Appellants contend that such an inference must be drawn, since Rupert invoked her Fifth Amendment privilege on a selective basis. According to Appellants, the letter allegedly written by Rupert, which is discussed above, is the instance where she decided not to assert her Fifth Amendment privilege. Given the absence of evidence that the letter in question was written by Rupert, there is no evidence that Rupert waived her privilege by writing that letter, and the argument on which the Appellants base their Tenth Assignment of Error lacks factual support. With respect to Judge Clark's refusal to reopen discovery in his November 6, 2001, decision (the

Eleventh Assignment of Error), the Appellants have failed to identify the discovery they would have taken, if that judicial officer had reopened discovery as they requested.

Accordingly, the Court overrules the Appellants' Ninth through Eleventh Assignments of Error.

6. *Bankruptcy Court's Grant of Summary Judgment in Favor of DTA and Refusal to Reconsider that Decision (Twelfth through Twentieth Assignments of Error)*

 In his Decision of May 15, 2001, Judge Clark sustained DTA's Motion for Summary Judgment and overruled that filed by Appellants. With those motions, the parties addressed the merits of DTA's claim that the checks which the Appellants received from DTA's trust account constituted fraudulent conveyances in violation of § 1336.04. If DTA were successful on that claim, White and Wenrick would be required to pay it (i.e., pay back) $3,260,000.00, and $1,625,000.00, respectively, the amount of the checks which were written on DTA's trust account to the Appellants on October 19, 1999. In his Decision of November 6, 2001, Judge Clark denied Appellants' request for reconsideration. With the Twelfth through Twentieth Assignments of Error, the Appellants argue that Judge Clark erroneously granted summary judgment to DTA and denied their request for same, and that he erred in refusing to reconsider that decision. A request for summary judgment presents a pure question of law; therefore, this Court reviews Judge Clark's grant of same to DTA under the *de novo* standard of review. *In re Cannon,* 277 F.3d 838, 849 (6th Cir.2002) ("Because a grant of summary judgment presents a pure question of law, the district court reviews the bankruptcy court's grant of summary judgment de novo, as do we in

turn. *In re Batie,* 995 F.2d 85, 88–89 (6th Cir.1993)."). The Court begins its analysis by examining the statutory basis of DTA's claim.

As indicated, Judge Clark concluded that DTA was entitled to summary judgment on its claim under § 1336.04, which provides, in pertinent part:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

\* \* \*

 (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Judge Clark noted that DTA was proceeding under an "unreasonably small assets" theory, as set forth in § 1336.04(A)(2)(a). That judicial officer recognized that to succeed on such a claim, DTA had to prove that "the debtor [DTA] transferred an interest in its property for less than reasonably equivalent value leaving it with unreasonably small assets compared to the debtor's 'historical level of assets or cash flow and current needs.'" 262 B.R. at 728 (quoting *Aristocrat Lakewood Nursing Home v. Mayne,* 133 Ohio App.3d 651, 668, 729 N.E.2d 768, 780 (1999)). On ap-

peal, Appellants do not argue that the elements of a claim under an "unreasonably small assets" theory, pursuant to § 1336.04(A)(2)(a), are different from those identified by the Bankruptcy Court. However, with their Twelfth through Twentieth Assignments of Error, the Appellants argue that the Bankruptcy Court erroneously concluded that the evidence failed to raise a genuine issue of material fact concerning those elements. The Court begins by examining the first element of such a claim, i.e., did DTA transfer an interest in its property.

The uncontroverted evidence established that, on October 19, 1999, Chari deposited a check for $5,000,000.00 into DTA's trust account at NCB. The purpose of that deposit was to permit White and Wenrick to be paid for their last bridge loans to Chari and Invesco. On that same date, DTA, in accordance with Chari's instructions, wrote a check from its trust account, payable to White in the sum of $3,260,000.00, and a check from its trust account, payable to Wenrick in the amount of $1,625,000.00. White took his check to NCB and was given an official bank check in the amount of $3,200,000.00. Wenrick deposited his check in an account at Security National Bank, and that check cleared DTA's trust account at NCB on October 25, 1999. The check which Chari had deposited in DTA's trust account was returned to NCB on October 26, 1999, because it was a forgery which had been written on a non-existent account. Thus, in the Bankruptcy Court, DTA sought to set aside the two transfers to White and Wenrick as fraudulent under § 1336.04(A)(2)(a) and thus to recover the funds so paid.

Appellants argued in the Bankruptcy Court, and continue to argue on appeal, that the funds transferred to them by the two checks were not DTA's property, because they were written on its trust ac-

count. The Appellants pointed out that the funds in DTA's trust account belonged to third parties, rather than to DTA. Judge Clark rejected that argument, concluding, as a matter of law, that the money transferred to Appellants was DTA's property. To reach that conclusion, the Bankruptcy Court initially noted that, in instances in which a debtor's account merely serves as a conduit, courts have held that the debtor does not have a property interest which is recoverable for the bankruptcy estate as a fraudulent or preferential transfer. 262 B.R. at 729 (citing *In re Chase & Sanborn*, 813 F.2d 1177, 1181–82 (11th Cir.1987); *In re Montgomery*, 983 F.2d 1389, 1395 (6th Cir.1993)). Based upon that authority, Judge Clark concluded that an account is used as a mere conduit and, thus, the debtor whose account is used does not have a property interest, when a third party lends money to the debtor for the intended purpose of paying a selected creditor of the third party. *Id.* Thus, an account is used as a mere conduit, if the debtor has not exercised control over the third party's funds, and the transfer does not diminish the debtor's property. *Id.* Since the $5,000,000.00 check which Chari had deposited in DTA's trust account was returned, Judge Clark concluded that DTA's trust account was, as a matter of law, not a mere conduit. *Id.* at 729–31. Consequently, Judge Clark concluded that the funds transferred to White and Wenrick were, as a matter of law, DTA's property, and thus could be recovered, under a fraudulent conveyance theory, as a preferential payment.

On appeal, Appellants argue, *inter alia*, that Judge Clark applied the incorrect legal standard to conclude that the funds transferred to White and Wenrick were property of DTA. To support that argument, the Appellants rely on an intervening decision by the Sixth Circuit. After

Judge Clark had granted summary judgment to DTA and denied Appellants' request for reconsideration, the Sixth Circuit issued its opinion in *In re Cannon, supra.* Therein, the Sixth Circuit considered whether funds transferred from the debtor's trust or escrow accounts to a brokerage could be set aside under 11 U.S.C. § 548, as preferential. The debtor, Cannon, had been a Tennessee attorney, whose practice was limited to real estate closings. He averaged between 120 and 150 closings per month, and between $5,000,000.00 and $10,000,000.00 flowed through his trust accounts on a monthly basis. At some point, the debtor began to embezzle funds from his trust accounts.[8] The debtor spent some of the funds he had embezzled trading commodities through a brokerage, J.C. Bradford & Co. ("Bradford"). During the year before he declared bankruptcy, Cannon wrote 21 checks on his trust accounts to Bradford, for more than $1,000,000.00. Cannon's bankruptcy trustee moved to set aside those payments as preferential, under 11 U.S.C. § 548. The Sixth Circuit rejected the trustee's efforts in that regard, concluding that the funds in Cannon's trust accounts were not "property of the debtor." The Sixth Circuit began its analysis, by noting that § 548 provides that a trustee may avoid or set aside any transfer of an interest of the debtor in property. 277 F.3d at 849. Although the Bankruptcy Code does not define "property of the debtor," the Sixth Circuit recognized that § 541 defines "property of the estate" broadly and applied that definition to determine whether the money in Cannon's trust accounts constituted "property of the debtor." *Id.* Based upon Supreme Court authority, the Sixth Circuit concluded that property which a debtor holds in an express trust for another is not "property of the estate" and, thus, not "property of the debtor." *Id.* The Sixth Circuit then examined Tennessee law to conclude that the money in Cannon's trust accounts was held in an express trust for others. *Id.* at 849–50. As a result, the *Cannon* court concluded that the money which Cannon had transferred from his trust accounts to Bradford was not his property and not subject to the trustee's avoidance (or recovery) powers under § 548.

■■■■ *Cannon* is directly on point for this appeal, since both cases involve attempts to set aside transfers from the trust account of someone who held money from real estate closings in escrow. True, there is a difference between the two cases, since the trustee in *Cannon* sought to avoid a transfer under § 548, while DTA successfully set aside the transfers to White and Wenrick as fraudulent under § 1336.04(A)(2)(a). Nonetheless, that difference does not cause this Court to disregard the standards set forth in *Cannon,* i.e., that money a debtor holds in express trust for others is not "property of the debtor" and that one must look to state law to ascertain whether the debtor holds the money in express trust for others.

As Judge Clark acknowledged in his May 15th decision, the threshold issue in a fraudulent conveyance action is whether the transfer involved a property interest of the debtor. 262 B.R. at 728. The Bankruptcy Court also noted that the same threshold issue exists in preference actions under § 548. *Id.* No party in this action has suggested that Ohio's fraudulent conveyance statutes apply to transfer something other than a property interest of the debtor. As is indicated, the Sixth Circuit in *Cannon* initially considered whether funds transferred from the debtor's trust

---

8. After the embezzlement had been discovered, the debtor filed a petition for bankruptcy.

He was subsequently disbarred and sentenced to a term of incarceration for his theft.

accounts to Bradford was *property* of the debtor. Consequently, this Court and the Sixth Circuit in *Cannon* are addressing the same threshold issue, to wit: was the money transferred from the debtor's trust account "property of the debtor." Like the Bankruptcy Code, Ohio's fraudulent conveyance statutes do not define "property of the debtor." No decision by an Ohio court has been found, indicating that transfers of property held by a debtor in an express trust for another can be set aside as fraudulent, because such is "property of the debtor." Moreover, there is no reason to conclude that an Ohio court would adopt such an interpretation of the Ohio statutes, contrary to the reasoning of the Sixth Circuit in *Cannon.* In addition, it bears emphasis that the power to set aside transfers under a state law, such as in § 1336.04(A)(2)(a), is contained in 11 U.S.C. § 544(b), which provides that a transfer "of an interest of the debtor in property" may be set aside. Given that § 544, like § 548, permits the setting aside only of transfers of "property of the debtor," *Cannon* constitutes authority for the meaning of that phrase in the current dispute.

Accordingly, this Court concludes that it must follow the standards set forth by the Sixth Circuit in *Cannon,* in order to determine whether the money transferred from DTA's trust account at NCB to White and Wenrick was property of DTA, and thus recoverable by DTA. Therein, the Sixth Circuit held that funds transferred from the debtor's trust accounts were not "property of the debtor," because, under state law, the debtor held those funds in express trust for others. Therefore, to decide whether the funds transferred from DTA's trust account to White and Wenrick consti-

tuted "property of the debtor," one must examine state law to determine whether DTA held those funds in an express trust for others.[9] In contrast, Judge Clark applied a control test, under which property in a debtor's account will be considered to be "property of the debtor," if the debtor has exercised control over the third party's funds, or the transfer diminished the debtor's property. The test applied by Judge Clark, unlike the standards adopted by the Sixth Circuit in *Cannon,* does not require that one examine state law to determine whether the debtor held the funds transferred in express trust for others. The application of the test adopted by the Sixth Circuit in *Cannon* could cause the Bankruptcy Court to conclude that the funds transferred to White and Wenrick were not DTA's property and that, therefore, the transfers cannot be set aside as fraudulent or preferential under § 1336.04(A)(2)(a). Since Judge Clark did not resolve the adversary proceeding under the standards adopted in *Cannon* (that case was decided after the Appellants had filed their notice of appeal), and given that the parties have not briefed the question of Ohio law, this Court vacates the decision of the Bankruptcy Court to grant summary judgment to DTA. This matter is remanded to the Bankruptcy Court for the purpose of applying the standards set forth in *Cannon.* In light of this ruling, the Court finds the Appellants' Assignments of Error addressed to the other elements of DTA's claim under § 1336.04(A)(2)(a) to be moot.

Based upon the foregoing, the Court sustains the Appellants' Thirteenth, Nineteenth and Twentieth Assignments of Error and overrules, as moot, their Twelfth and Fourteenth through Eighteenth Assignments of Error. Judge Clark's decision of May 15, 2001, is vacated, and this

---

9. Notably, neither of the cases relied upon by Judge Clark, *In re Chase & Sanborn,* and *In re Montgomery,* involved the transfer of property from an express trust held by the debtor for another person.

matter is remanded for further proceedings in accordance with this opinion.

### 7. Twenty–First through Twenty–Third Assignments of Error

With these Assignments of Error, the Appellants challenge Judge Clark's decisions to decline to reach their claims and defenses against NCB (Twenty–First Assignment of Error), to award prejudgment interest and costs to DTA (Twenty–Second Assignment of Error) and to permit DTA to file and to record certificates of judgment against them, notwithstanding the stay of execution which had been granted after Appellants had submitted supersedeas bonds (Twenty–Third Assignment of Error). Given that the Court has vacated the grant of summary judgment in favor of DTA and remanded this matter for further proceedings, the decisions of Judge Clark to decline to reach Appellants' claims and defenses against NCB (Twenty–First Assignment of Error), to award prejudgment interest and costs to DTA (Twenty–Second Assignment of Error) and to permit DTA to file and to record certificates of judgment against them (Twenty–Third Assignment of Error) are also vacated and remanded. Accordingly, the Court overrules the Twenty–First through Twenty–Third Assignments of Error, without addressing their merits.

### B. Cross Appeal of DTA and DTABT

DTA and DTABT have supported their appeal with two assignments of error, which the Court will address in the order presented.

### 1. This Court should reverse the Bankruptcy Court and find that [DTABT] is eligible to be a debtor under the Bankruptcy Code (First Assignment of Error)

In his Decision of May 15, 2001, Judge Clark concluded that DTABT was not a separate entity entitled to institute bankruptcy proceedings and, thus, to initiate an adversary proceeding against the Appellants. Consequently, Judge Clark granted summary judgment to Appellants on DTABT's claim against them. DTABT appeals that decision. As is indicated, this Court reviews the grant of summary judgment under a *de novo* standard of review. For reasons which follow, the Court concludes that Judge Clark applied the improper legal standard when he granted summary judgment to Appellants on the claim of DTABT. Accordingly, the Court vacates that grant of summary judgment and remands for purposes of applying the correct legal standard.

DTABT is a name given to DTA's trust accounts. In his decision, Judge Clark noted that the uncontroverted evidence established that DTABT had no written agreement or articles of incorporation memorializing its creation, that it had no principals, officer or employees, that it had no tax identification separate from that of DTA and that it did not generate income. 262 B.R. at 727. That judicial officer also recognized that the uncontroverted evidence established that DTABT had been established at the behest of DTA's insurance underwriters to ensure that the money deposited in DTA's trust accounts would not be commingled with its operating funds. *Id.* On appeal, DTABT does not argue that the evidence raises a genuine issue of material fact as to any of those points.

Under 11 U.S.C. § 109(a), only "persons" are entitled to seek relief under the bankruptcy laws. "Persons" are defined to include corporations. 11 U.S.C. § 101(41). Corporations are, in turn, defined to include business trusts. 11 U.S.C. § 101(9)(A)(v). Since the phrase "business trust" is not defined by the Bankruptcy Code, Judge Clark looked to an unpublished decision by the Sixth Circuit to ascertain its meaning. *In re Kenneth Allen*

*Knight Trust,* 1997 WL 415318 (6th Cir. 1997). Therein, the Sixth Circuit noted that, unlike business trusts, other types of trusts are not eligible to seek relief under the Bankruptcy Code. With respect to the meaning of business trusts, the Sixth Circuit wrote that, "because the [Bankruptcy] Code defines a business trust as a species of corporation, courts examine the trust at issue and pronounce it a business trust when it has the attributes of a corporation." *Id.* at *3. The Sixth Circuit also adopted the "primary purpose test" for determining when a trust is a business trust, writing "trusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts." *Id.* at *4. Based upon the unrefuted evidence cited above, Judge Clark concluded that DTABT lacks the attributes of a corporation, and that, therefore, it was not a business trust. That judicial officer failed to consider whether DTABT met the primary purpose test. DTABT does not argue that Judge Clark erroneously concluded that it lacks the attributes of a corporation; rather it contends that he applied the incorrect legal standard. In its recently issued decision, *In re Kenneth Allen Knight Trust,* 303 F.3d 671 (6th Cir.2002), the Sixth Circuit clarified that the primary purpose test

must be applied to determine whether a trust (or, in this case, a trust account) is a business trust and, thus, eligible to file for bankruptcy.[10] Based upon that decision, which will be published, this Court concludes that the primary purpose test must be applied to determine whether something is a business trust. Since Judge Clark did not apply that standard, this Court vacates the award of summary judgment in favor of Appellants and against DTABT and remands this matter for an application of the correct legal standard.[11]

Accordingly, the Court sustains the First Assignment of Error asserted by DTABT.

*2. This Court should reverse the Decision and Order of the Bankruptcy Court denying Plaintiffs' Motion to Disqualify Defendants' counsel (Second Assignment of Error)*

As is indicated, DTA moved to disqualify Appellants' counsel, Coolidge, Wall, arguing that the law firm had violated DR 7–104(A) by interviewing Rupert without providing advance notice to its counsel.[12] Appellants responded to that motion, by indicating that Rupert was a former employee of DTA when the interview occurred, and pointing to Advisory Opinion 96–001 from the Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court, which provides that an attorney does not violate DR 7–104(A) by

---

**10.** In that decision, the Sixth Circuit did not discuss its previous statement that courts will conclude that something is a business trust, "when it has the attributes of a corporation."

**11.** One might argue that applying the primary purpose test is not likely to result in a different outcome (i.e., Judge Clark is not likely to conclude that DTABT is a business trust). It bears emphasis that Judge Clark, as the trial judge, must make the necessary findings on the issue of whether DTABT is a business trust and that this Court, sitting as an appellate court reviewing that determination, can-

not make those findings in the first instance. *In re Allen Knight Trust,* 1997 WL 415318 (6th Cir.1997).

**12.** DR 7–104(a) provides, in pertinent part:
(A) During the course of his representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

interviewing a former employee of a corporation. Judge Clark denied DTA's request to disqualify Coolidge, Wall.

■ This Court reviews that denial under an abuse of discretion standard of review. *In re Valley–Vulcan Mold Co.*, 5 Fed.Appx. 396, 2001 WL 224066 (6th Cir. 2001). That standard of review is a "generous" one, and Judge Clark is given "wide latitude" in ruling on DTA's request to disqualify Coolidge, Wall. *United States v. Mays*, 69 F.3d 116, 121 (6th Cir.1995), *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). This Court concludes that Judge Clark did not abuse his discretion.

■ The parties devote their briefs to arguing over whether lawyers employed by Coolidge, Wall violated DR 7–104(A), by interviewing Rupert after she had ceased to be an employee of DTA. It is not necessary to resolve that question, because, assuming for sake of argument that such a violation occurred, Judge Clark did not abuse his discretion in refusing to disqualify Appellants' counsel. Courts have uniformly held that it is not proper to disqualify an attorney for violating DR 7–104(A), unless the party seeking disqualification demonstrates that the alleged violation caused it to suffer prejudice. *Meat Price Investigators Association v. Spencer Foods, Inc.*, 572 F.2d 163 (8th Cir.1978); *Kitchen v. Aristech Chemical*, 769 F.Supp. 254 (S.D.Ohio 1991). Herein, DTA has not argued, much less demonstrated, that it suffered prejudice as a result of the asserted violation of DR 7–104(A) by Coolidge, Wall. Indeed, it is difficult to fathom how DTA could have suffered such prejudice,

given that Rupert asserted her Fifth Amendment privilege and refused to present evidence in the adversary proceeding.[13]

Accordingly, the Court overrules DTA's Second Assignment of Error.

In sum, the Court has affirmed in part and vacated in part the decisions of Judge Clark. This matter is remanded to that judicial officer for further proceedings in accordance with this Opinion.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

**13.** DTA also argues that Judge Clark should have disqualified Coolidge, Wall, because its representation of Appellants created conflicts of interest with certain third parties. *See* Doc. # 18 at 30–31. For the reasons which this Court has concluded that Appellants do not have standing to seek disqualification of DTA's counsel, as a result of counsels' asserted conflict of interest with Rupert, the Court concludes that DTA does not have standing to seek disqualification of Coolidge, Wall, on the basis of *its* asserted conflicts of interest with third parties.